**Irving GOTTLIEB et al.**

v.

**SANDIA AMERICAN CORPORATION**
(formerly know as Sandia American
Development Corporation) et al.

**Civ. A. No. 33924.**

United States District Court
E. D. Pennsylvania.

Sept. 12, 1969.

William R. Pomerantz, Philadelphia, Pa., for plaintiffs.

Alan I. Aberman, Philadelphia, Pa., for S. Goldblatt.

Pace Reich, Esq., Modell, Pincus, Hahn & Reich, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

WOOD, District Judge.

This action was brought to recover damages for alleged violations of Rule 10b–5 issued under the Securities Exchange Act of 1934 and of Section 17(a) of the Securities Act of 1933 [1] in connection with a reorganization transaction in which Sandia American Development Corporation acquired World Wide Bowling Corporation, whose former stock-and-debentureholders are the plaintiffs. After a review of the trial record as well as the proposed findings of fact and conclusions of law submitted by the parties, we entered Preliminary Findings of Fact and Conclusions of Law and requested additional briefing of two central issues which we did not consider had been fully discussed in the initial briefs of the parties. We have now received and reviewed these additional memoranda and make the following findings of fact and conclusions of law. Our preliminary findings and conclusions, which are unchanged, have been inserted in their appropriate context.

### FINDINGS OF FACT

1. The plaintiffs are former stockholders of World Wide Bowling Enterprises, Inc.

2. The defendants are the Sandia American Corporation and its individual officers and directors.

3. The actions against Pauline Wechsler and Sigmund Goldblatt have been dismissed by agreement of counsel. (N.T. 5, 7)

4. Plaintiff Irving Gottlieb is a Certified Public Accountant and was President of World Wide Bowling Corporation at the time of the transactions involved in this case. (N.T. 13–14)

5. During 1961, World Wide Bowling Corporation was suffering from financial difficulties, and its officers and directors felt that it would be unable to resolve its financial difficulties with its existing assets. They decided to place an ad in the Wall Street Journal during February 1962 requesting a merger bid. (N.T. 14–15)

6. Among the responses to this ad was an inquiry from Sandia American Development Corporation. Gottlieb was initially very impressed with the personages on Sandia's Board of Directors, which included James Roosevelt. Mr. Nathan Wechsler, special counsel to and a controlling stockholder of Sandia, briefed Gottlieb generally about Sandia's conglomerate operations. Wechsler informed Gottlieb that Sandia had three alleys which it was already operating with some success and that he felt that these three alleys and the three run by World Wide could be operated efficiently without additional management. (N.T. 17)

7. During the period in which the events here at issue occurred, Sandia held approximately 19 subsidiaries in varying degrees of control. (See Ex. D–7)

8. Sometime in February or March 1962, Wechsler invited Gottlieb to Washington to examine the books and records of Sandia. During their discussions, Gottlieb was shown the Consolidated

---

1. Securities Act of 1933, § 17, 15 U.S.C.A. § 77q; Securities Exchange Act of 1934, § 10, 15 U.S.C.A. § 78j.

Balance Sheet for Sandia American Development Corporation as of December 31, 1961, in which the following items were listed as "Fixed Assets":

| | |
|---|---:|
| Bowling Alley Sites and Leaseholds | $1,088,000.00 |
| Bowling Lanes and Equipment | 1,645,842.39 |
| Leasehold Improvements | 2,470.87 |
| | $2,736,313.26 |
| Less: Depreciation and Amortization | 16,591.07 |
| | $2,719,722.19 |

(Exhibit P–1; Ex. A, p. 1)

---

Also in the same document in the Consolidated Income Statement under "Net Profit from Bowling Operations: Other Income" was the following item:

| | |
|---|---:|
| Profit from Sale of Leaseholds | $123,545.14 |

(Exhibit P–1; Ex. B)

---

9. The Audit of Sandia American Development Corporation of December 31, 1961, was a consolidated balance sheet and income statement which included several Sandia subsidiaries, namely, Texas Frontier Development Corporation, G and W Development Corporation, J–Town Lanes Corporation, Sandia Buffalo Bowling Corporation and Sandia Portsmouth Bowling Corporation. (Ex. P–1)

10. The thirteen Sandia subsidiaries which were not consolidated in the balance sheet of December 31, 1961 (Ex. P–1) were represented on that balance sheet as an asset item, "Net Investment in Non-Consolidated Controlled Affiliates, $94,620.12." (N.T. 117–8)

11. When Gottlieb questioned Wechsler further as to the representations on the balance sheet and the transactions therein involved, Wechsler told him that "the records are so complex and so involved because of the many entities, that it would take an awful long time to make a complete examination and that I (e. g. Gottlieb) should rely on the statement that he gave me. (N.T. 93) * * I am a Certified Public Accountant, and if you had to delve into these books in an attempt to develop this statement it would take months and months for you to do." (N.T. 23, 24)

12. Wechsler showed Gottlieb a statement of net worth showing that he (Wechsler) was worth in excess of $5 million (Ex. P–4); Gottlieb was impressed with Wechsler as a man of means who would be able to infuse capital into the World Wide operation, which he believed was a necessity if the World Wide alleys were to become profitable. (N.T. 31)

13. In the course of their conversations, Wechsler described Sandia in glowing terms and stated that the assets on the balance sheet of December 31, 1961, (Ex. P–1) were substantially understated. (N.T. 17, 20)

14. After further preliminary negotiations, Gottlieb called a meeting of the World Wide stockholders to inform them of the details of Sandia's offer. (Exhibit P–6) At the meeting, Gottlieb explained *inter alia* that he did not think that World Wide assets and financial resources were sufficient to make further operations profitable, and that he thought Sandia had the management and capital backing needed to make World Wide lanes profitable.

15. A special meeting of the stockholders and debenture holders of World Wide on May 10, 1962 approved the proposed exchange of their World Wide holdings for common stock in Sandia.

16. The shareholders of World Wide relied among other things in giving their approval on the financial resources of Sandia, especially the consolidated statement of December 31, 1961. Gottlieb received the financial information from Wechsler and others and he conveyed that information to World Wide holders at the May 10 meeting. He stated at the stockholders meeting that World Wide could not as it was then constituted generate enough money to pay a dividend, meet its obligations, or make improvements in its alleys which were necessary before they could become profitable. However, Gottlieb told the World Wide shareholders that Sandia had the necessary capital to make World Wide operations profitable because it had cash surplus, other interests to generate earnings, and three other bowling alleys. (Exhibit P–2, pp. 16–20)

17. As of April 30, 1962, World Wide had a stockholders equity of $178,110. In addition its stockholders held subordinated non-interest-bearing debentures in the amount of $42,444. (N.T. 60–1, Ex. P–6)

18. At the time of the acquisition of World Wide by Sandia, Sandia stock was valued at approximately $5 per share because it was trading on the over-the-counter market for approximately $5 per share at that time, and because Gottlieb determined that the net worth of Sandia divided by the number of shares outstanding was approximately $5 per share. (N.T. 30)

19. On May 14, the approved exchange occurred and stockholders of World Wide received 31,751 shares of Sandia common, and debenture holders of World Wide received 9,600 shares of Sandia common stock, in return for their holdings of World Wide.

20. At the time of the exchange, Sandia was a publicly held company whose stock was sold over-the-counter. The stock was quoted as 3½ bid, 5½ asked. (Exhibit P–2, p. 6–7)

21. Subsequent to the acquisition of World Wide by Sandia, Gottlieb became a member of the Board of Directors of Sandia American Development Corporation. (N.T. 38) Beginning in September, 1962, Gottlieb became disenchanted with the operation and financial condition of Sandia and requested an outside independent audit. At about the same time, Gottlieb read the Annual Report of the American International Bowling Corporation for 1962. (Ex. P–3)

22. The 1962 Annual Report of the American International Bowling Corporation submitted November 26, 1962, contained the following footnote at page 8 therein:

"(5) Contract with Sandia American Development Corporation:

"During the year ended June 30, 1962, the Company sold to Sandia American Development Corporation, three bowling centers with 112 lanes which it had developed for Sandia in accordance with the terms of an agreement dated March 15, 1961, as amended. * * *

"In turn, Sandia reimbursed the Company $112,000 for certain advances and paid the balance of the purchase price by executing noninterest-bearing promissory notes totaling $784,000 payable in monthly installments over fifteen and twenty years, the prime terms of the applicable building leases. Under the terms of the contract, additional amounts may be received from Sandia if these centers are operated beyond these periods

"The above notes have not been recorded by the Company and accordingly are not reflected in the accompanying consolidated balance sheet. Payments received thereon will first be applied to reduce the deferred balance at June 30, 1962 of $65,601, classified as Deposits and Other Assets, representing unreimbursed expenditures and home office development costs applicable to these locations. Payments by Sandia in excess of this amount will be taken into income as received." (Exhibit P–3)

23. Upon seeing the AIBC report, Gottlieb was disturbed because the

$784,800 liability of Sandia to AIBC reported therein had not been included on the Sandia balance sheet shown him of December 31, 1961. (Ex. P–1, N.T. 44) When he did not receive an independent audit, and when other circumstances appeared which he considered improper, Gottlieb resigned from the Sandia Board of Directors in January, 1963. N.T. 45–54) He thereupon sought legal advice and attempted to rescind the Sandia-World Wide merger. Upon Sandia's refusal to grant rescission, the instant suit was initiated. (N.T. 45)

24. At the time that the acquisition of World-Wide by Sandia was consummated, Gottlieb was unaware of the arrangements by Sandia and its officers to place the lanes from AIBC into the control of subsidiary which in turn might sell the leaseholds to Star Associates and then lease them back. (N.T. 63, 67, 71–2, 73–4, 84)

25. Sandia American Development Corporation entered into a contractual arrangement with the American International Bowling Corporation on February 18, 1961. (Ex. D–1) This agreement provided *inter alia* that:

"1. The Seller (i. e. AIBC) agrees to sell, convey and transfer to the Purchaser free from all liabilities and encumbrances, except as hereinafter assumed by the Purchaser, bowling center establishments at locations which the Seller may select, aggregating six (600) hundred lanes, which the Seller will establish, develop and complete as a turnkey package so that each bowling center will be ready for opening and for operation with complete chattels, fixtures, machines and equipment.

"2. The Purchaser agrees to purchase from the Seller each of said bowling centers that the Seller shall develop specifically for the Purchaser, provided only that the Brunswick Corporation has given its prior approval of the location and designated the number of lanes to be operated at each of said locations."

The total aggregate purchase price of the 600 lanes was to be $31,132,500.00, to be paid for with the deposit of $1,000 per lane and the making of a promissory note for the balance. It was further provided that:

"The Purchaser does undertake and agree in addition to assume any and all conditional bills of sale and/or chattel mortgages for chattels and equipment included in each bowling center which exists at the time of transfer of each bowling center establishment."

Article 15 of this agreement provided in part that:

"15. The Purchaser, in order to insure to the Seller that it will have in part the cash down-payments per lane as required under this contract has agreed to segregate certain of its liquid assets more particularly described in *SCHEDULE E,* annexed hereto, and hold same in trust for its partial performance under this agreement. * * * This said trust shall continue during the term of this agreement and terminate only upon the Purchaser' setting aside a sum equal to $600,000 to cover the total cash requirements under this agreement. * * * "

Section 18 of the agreement provides that:

"The note, chattel mortgage and sublease shall contain a provision that in the event of a default on the part of the Purchaser on its unpaid instalment obligations, the Seller will look solely to the assets situated at each bowling center and will not look to the purchaser for any deficiency that may exist at the time of such default."

26. On March 15, 1961, AIBC and Sandia executed another agreement (Ex. D–2) providing for the purchase by Sandia of another 600 lanes for a price of $31,132,500.00, making the aggregate price for the 1200 lanes under the two agreements $62,265,000.00. The terms of the February 18, 1961, agreements were incorporated into the March 15 agreement.

27. A supplemental agreement to the agreement of February 18, 1961 (Ex. D–2–A) provided in part that:

"1. The Seller agrees that the Purchaser may at its option set up a new subsidiary corporation to acquire the assets, or purchase the stock of each bowling center at the time of closing, and in the event of a default in the obligations created under the Promissory Note and Chattel Mortgage and Sublease, the Seller will hold Sandia harmless and look only to the assets of said separate subsidiary corporation, or its assets at each bowling center, and it is further agreed that the balance of the purchase price as determined by the Agreement shall be paid by said subsidiary corporation, and said subsidiary corporation shall execute the single or series of Promissory Notes, the Chattel Mortgage, the Sublease, or any other security instrument provided for in the original Agreement."

28. The prospectus of the American International Bowling Corporation dated February 13, 1962 (Ex. D–9) stated in relevant part at page 15 that:

" * * * the Company has entered into agreements with Sandia American Development Corp. ('Sandia') dated * * * March 15, 1961 by the terms of which * * * 36 bowling centers with 1,200 lanes would be sold to and operated by Sandia in the United States. All of the aforesaid bowling centers would be constructed in accordance with the Company specifications. The Company would also select all sites and purchase all equipment in connection therewith. The purchase price for centers sold to Sandia * * * would be payable as follows: $350 per lane for the first, second, and third years, $455 per lane for the fourth and fifth years, $717.50 for the sixth, seventh, and eighth years, and $1,137.-50 during the ninth through the fiftieth year. In addition, the Company would receive a management and consultant's fee and expenses for which the Company would not be accountable amounting to $120 per lane per year. Construction of centers under this agreement will depend on satisfactory financial arrangements being made by Sandia * * * for which there is no assurance.

" * * * Sandia has made initial payments under the above agreement for the purchase of three centers from the Company (Jeffersontown, Ky. (24 lanes), Buffalo, N. Y. (48 lanes) and Portsmouth, N. H. (40 lanes)."

29. Star associates was a partnership composed of Herbert Wechsler, Nathan Wechsler, Sigmund Goldblatt and E. Carl Hengen (N.T. 142) which was set up to purchase leaseholds of subsidiaries of Sandia American Development Corporation, and to assume obligations thereunder. Star's general purpose was "to give the momentum and profit to Sandia or its subsidiaries by taking the load of any obligations off of the back under the original contract, * * * " (N.T. 202)

30. During the period in dispute in this litigation, Sandia American Development Corporation had no ownership interest in Star Associates. (N.T. 123)

31. The Star Associates balance sheet of December 31, 1961 (Ex. D–8) shows the following entries:

## ASSETS

FIXED ASSETS:
Leaseholds:

| | |
|---|---|
| J–Town Lanes Corporation | $1,256,701.87 |
| Sandia Buffalo Bowling Corporation | $2,529,345.00 |
| Sandia Portsmouth Bowling Corporation | $2,121,071.96 |
| Total Fixed Assets | $5,907,118.83 |

* * * * * * *

LIABILITIES

FUNDED DEBT:

Notes Payable, Leaseholds:
American International
Bowling Corp.                                    $5,809,533.34

---

32.  As of December 31, 1961, AIBC had not accepted Star Associates on the notes executed pursuant to the agreements of February 18 and March 15, nor had AIBC released Sandia and its subsidiaries from all liability under the agreements.

33.  The assets of World Wide which were transferred to Sandia as a result of this transaction are no longer operated or controlled by Sandia.  Tri-Boro Lanes reverted back to the landlord of the building because Sandia was unable to meet rent payments.  Street Lane Bowling Alley was lost by default, along with $45,000 in lease security.  Colonial Lanes were closed and the real estate on which it was located was sold. (N.T. 49–51)

34.  At some time between January 1963 and the trial of this case, Sandia stock ceased to be sold on the over-the-counter market and as a practical matter became untradable.  (N.T. 54)

## DISCUSSION

### I.  *Liability*

██  The essential complaint of the plaintiffs is that they were either misinformed or not informed at all of a number of material facts concerning the operation of Sandia American Development Corporation in connection with the acquisition of World Wide by Sandia. More specifically, the plaintiffs allege that they were not accurately apprised of all the arrangements by which Sandia and its subsidiaries contracted with the American International Bowling Corporation (AIBC) to purchase and operate bowling alleys.  In this regard, the plaintiffs complain that there were several material misrepresentations and omissions in the Statement of Sandia of December 31, 1961 (Ex. P–1), including the failure to mention the liabilities of Sandia or its subsidiaries of over $5,000,000 in connection with its contractual agreements to acquire bowling centers from AIBC.  Mr. Gottlieb, who was president of World Wide and who negotiated the sale of World Wide to Sandia, testified very credibly that he was not informed of these arrangements prior to consummation of the sale, and that he did not become aware of such arrangements until he noticed a statement in the 1962 Annual Report of AIBC that prior to December 31, 1961, Sandia had executed promissory notes to AIBC for approximately $784,000.

We found the defendants' attempts to explain the circumstances surrounding Sandia's arrangements with AIBC and the reasons why these were not communicated to Gottlieb and the other World Wide stockholders to be vague, confusing, and frequently inconsistent.  Although the details of the labyrinthine arrangements between Sandia, its subsidiaries, AIBC, and Star Associates were not fully explained to our satisfaction even at trial, the general outline of their explanation appears to be as follows: AIBC was in the business of developing bowling centers by purchasing ownership or leasehold interests in land, buildings, alleys, as well as other necessary fixtures, and coordinating their installations. Once centers were ready for operation, AIBC sold the lanes and the various interests which they had in the centers to other concerns who managed the alleys for their own profit.  Sandia entered into agreements with AIBC on February 18 and March 15 (Ex. D–1, D–2, D–2–A) pursuant to which AIBC agreed to sell

bowling centers aggregating up to 1,200 lanes to Sandia. The lanes were to be paid for by a deposit of $1,000 and the execution of promissory notes for the remainder. Sandia assumed a number of obligations as well under the contract. It was provided, however, that Sandia could at its option set up a subsidiary which would acquire any given bowling center under the contract which in turn would execute the necessary promissory notes, and that in the event of default upon such promissory notes executed to pay for the centers AIBC would "hold Sandia harmless" and look only to the assets of the designated subsidiary to make up any deficiency. It was further provided that "in the event of a default on the part of the Purchaser on its unpaid installment obligations, the Seller will look solely to the assets situated at each bowling center and will not look to the purchaser for any deficiency that may exist at the time of such default." Although their testimony was often contradictory, the defendants contend that all of the liabilities which were incurred or were to be incurred under their contract with AIBC had been assumed either by Sandia subsidiaries which were not consolidated in the audit of December 31, 1961 (P–1) or by companies in which Sandia had no ownership interest (e.g. Star Associates), so that Sandia was not required to mention such obligations on its balance sheet, and moreover that Sandia had no duty to inform World Wide stockholders of these arrangements under Rule 10b–5. They argue that in any event it was not important to disclose these liabilities because in the event of default of the aforementioned promissory notes, AIBC could look only to the alleys themselves for satisfaction of a deficiency.

To the contrary, we think that there were a number of material facts of which Gottlieb and the World Wide shareholders were not made aware before exchanging their stock and debentures with Sandia, and that these omissions or misrepresentations constitute a violation of Rule 10b–5 for which the defendants must he held liable.

In the first place, we think that Sandia did have existing obligations to AIBC as of December 31, 1961, which should have been represented on its balance sheet and communicated to Gottlieb. Wechsler testified (N.T. 123) that the only liabilities that had been incurred by any Sandia affiliates before December 31, 1961 were notes incurred by Sandia, J–Town Lanes Corporation (whose operations were not consolidated in the balance sheet shown to Gottlieb, e. g., P–1), and that before December 31, the leaseholds had been sold to and leased back from Star Associates, a partnership owned by officers and directors of Sandia but in which Sandia held no ownership interest. Therefore Wechsler said that since in the event of default AIBC could only look for the deficiency to the lanes themselves, and since the notes to pay AIBC for the alleys had been assumed by Star Associates, it was not necessary to put such obligations on the December 31, 1961, balance sheet. We disagree for a number of reasons. AIBC had not released Sandia as of December 31, 1961. AIBC still looked to Sandia for payment of the obligations under the contract, as illustrated by the statements in its Annual Report of 1962 and its prospectus dated February 13, 1962.[2] Moreover, we think that two other Sandia subsidiaries, Sandia Buffalo Bowling Corporation and Sandia Portsmouth Bowling Corporation, had given notes to AIBC: There was testimony that Sandia Buffalo and Sandia Portsmouth had undertaken or were obligated to undertake such obligations; the obligations appear on the Report of Audit of Star as of December 31, 1961, (Ex. D–8); and such obligations were mentioned in the AIBC prospectus dated February 13, 1962, (p. 15). Both Sandia Buffalo and Sandia Portsmouth were explicitly consolidated in the balance sheet of December 31, 1961 (Ex. P–1). The fact that Star might have assumed the liabilities, or that the creditor would

---

2. At p. 15 of the Prospectus of World Wide, February 13, 1962.

look only to the lanes for payment of their cost,[3] did not eradicate the liability because the obligation still represented a potential drain on an asset of Sandia or one of its consolidated subsidiaries. And even assuming, which we do not, that for some technical reason it was not necessary to represent these debts on the Sandia balance sheet, these facts were materially related to the fortunes of the Sandia enterprise and should have been disclosed to Gottlieb.

We think that there were other representations on the balance sheet relating to the AIBC contract which were misleading and should have been fully explained to Gottlieb but were not: For example, on the balance sheet of Sandia and its consolidated subsidiaries of December 31, 1961, (Ex. P–1) by far the largest asset items ($2,733,842.39 out of total assets of $3,578,483.98) were items which related to the AIBC deal:

Bowling Alley Sites
    and Leaseholds              $1,088,000

Bowling Lanes and
    Equipment                    1,645,000

Neither of these items was explained fully or accurately to Gottlieb. The sites and leaseholds item represented Wechsler's evaluation of the potential value of the contract with AIBC to build the 1,088 remaining of the 1,200 alleys Sandia had contracted to purchase. If Sandia really intended to have its unconsolidated subsidiaries take all contractual rights to receive alleys from AIBC it is hard to see how Sandia itself could realize $1,088,000 profit except perhaps by selling the rights to a subsidiary, creating a potential paper profit the details of which should have been disclosed to Gottlieb. The evaluation of $1,088,000 was made by Wechsler, a controlling stockholder of Sandia, of an asset which he sold to Sandia in exchange for his stock holding in Sandia. It was therefore a highly subjective valuation, and it was even more imperative for the details to be explained to Gottlieb. Moreover, construction of the bowling centers was not imminent as was represented to Gottlieb but was subject to a number of contingencies, none of which were adequately explained to Gottlieb:[4] The AIBC prospectus of February 13, 1962 stated that "construction of centers under this agreement will depend on satisfactory financial arrangements being made by Sandia * * * for which there is no assurance"; Sandia had assets of about $3 million and yet the purchase price of the alleys was to be over $60 million; whether all the lanes would eventually be purchased thus probably depended to a large extent on the success of Sandia's subsidiaries in operating the alleys and the continued ability of Star, a partnership managed by persons who owned a large share of Sandia the purpose of which was to absorb large liabilities incurred by the Sandia complex, to assume a staggering debt load. This precarious house of cards was never adequately explained to Gottlieb.

Aside from the question of whether Sandia's arrangements with AIBC, Star, and Sandia's subsidiaries were properly reflected on the balance sheet given Gottlieb, we think that as a practical matter such arrangements were so important to the future of the Sandia network and its owners, that Gottlieb and the other World-Wide share-and debentureholders should have been made cognizant of them before purchasing Sandia stock.

Finally, we think that Gottlieb was deceived as to the nature of the corporation he was getting into and the plans of Sandia's controlling stockholders for its future development. Gottlieb recognized that World Wide's three bowling centers needed capital to operate at their maxi-

---

3. This is not to mention other liabilities under the contract which were not assumed by Star Associates.

4. We believe all of what Gottlieb said concerning what was not told him about the Sandia enterprise and the AIBC contractual arrangements. We attached very little credibility to the testimony of Sandia's witnesses and did not believe their assertions that they explained these material factors to Gottlieb.

mum profitable level. It was represented to him that Sandia owned three centers as well and that the six centers could be operated more efficiently under unified management, and that Sandia had capital which it planned to infuse into such an operation in which Gottlieb and the other World Wide holders might participate. In fact Sandia had no such intention, and the World Wide assets were promptly dissipated.

In summary, there was a failure on the part of the officers and directors of Sandia to disclose material facts relating to Sandia's financial statements, to the general financial condition of Sandia, its subsidiaries and its owners, to the details of the contractual arrangements with AIBC for the purchase and operation of bowling centers, to the uncertainty and remoteness of profit to Sandia under such arrangements, and to the other potential liabilities to Sandia or its subsidiaries arising from the contract; and the failure of the defendants to make the World Wide share-and debentureholders aware of these facts prior to the consummation of the acquisition of World Wide by Sandia constitutes a violation of Rule 10b–5 for which the defendants may be held liable in damages. See e. g. Kardon v. National Gypsum Co., 73 F.Supp. 798 (E.D.Pa.1947); Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962); Heit v. Weitzen, 402 F.2d 909 (2nd Cir. 1968); Myzel v. Fields, 386 F. 2d 718 (8th Cir. 1967), cert. den. 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965); Mader v. Armel, 402 F. 2d 158 (6th Cir. 1968). See also Bromberg, Securities Laws: Fraud—SEC Rule 10b–5, Section 4.2, p. 69 (1969) and cases therein cited.

## II.  *Relief*

After a consideration of all the evidence, we have concluded that the remedies of strict rescission or simple monetary damages are either not practicable or will not adequately redress the wrong done the plaintiffs in this case. Damages in actions under Rule 10b–5 have usually been computed in accordance with the tort or "out-of-pocket", as opposed to the warranty, measure. "Normally this formula may be expected to yield the difference between the value of the security (not necessarily market value at the time of the defendant's purchase but presumably value at that time as judged in the light of the issuer's subsequent history) and the price paid the defendant for it (or the value of anything he may have given in exchange)." Loss, Securities Regulation, Vol. VI, p. 3922, citing Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 533 (10th Cir. 1962); and Myzel v. Fields, 386 F.2d 718, 744–745 (8th Cir. 1967), cert. den. 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). In this case, such a measure, if applied, would accordingly be the difference at the time of the exchange between the value of the World Wide stock and debentures and the value of the Sandia stock exchanged as determined by one aware of the material facts concerning Sandia withheld from World Wide shareholders and debentureholders and in light of Sandia's subsequent history. We think such a remedy would be inappropriate and impracticable for a number of reasons. The determination of the value of both Sandia and World Wide would be very difficult: World Wide stock was registered and sold publicly some time prior to the exchange here at issue, but by the time of the exchange it had become untradable. At the time of the exchange, Sandia was a publicly held company whose stock was sold over the counter and quoted at 3½ bid, 5½ asked. At some time after the exchange (precisely when is not certain from the evidence), Sandia stock became untradable. Aside from the difficulty of determining the value of a large but not controlling share of a company whose stock is publicly held but not generally traded, the valuation of Sandia at the time of the exchange would be extremely difficult to decide. Determination of Sandia's true value would require an estimation of what Sandia (including its

holdings in nineteen subsidiaries) was worth to one who was aware of the true state of affairs at Sandia at that time, i. e., had all the material facts been fully disclosed. This would in turn require the determination of the true state of affairs at Sandia in 1962, something which (apart from the difficulty of exhuming what corporate records are still extant) the officers and directors who testified before us seemed unclear or evasive about.[5] This is not, therefore, a case where one material fact whose value to a company may be rapidly ascertained has been withheld, but rather one of pervasive fraud on the plaintiffs. We are loathe to make what would be a very speculative assessment of the value of Sandia under the circumstances of this case. Cf. Pappas v. Moss, 257 F.Supp. 345, 368–689 (D.N.J.1966) rev'd and remanded 393 F.2d 865 (3rd Cir. 1968). In any event, even if such damages could be computed with requisite certainty, the resulting relief would still not be entirely equitable to the plaintiffs because they would still have their Sandia stock. Had the plaintiffs known all of the relevant facts concerning Sandia at the time of the exchange it is highly doubtful that they would have chosen to become Sandia stockholders. Indeed, when Gottlieb and the other major World Wide stockholders began to unearth some of the facts that had been withheld from them, they demanded an accounting and a return of the World Wide assets, but the request was rebuffed by the officers of Sandia. Because of the size of their holdings, it would undoubtedly be impractical for them to sell their Sandia stock to anyone but the present major holders of Sandia.

At the same time, a remedy of strict rescission has been made impossible by the acts of the defendants in spinning off and subsequently relinquishing their ownership interest in the former World Wide assets (contrary to their representations to Gottlieb at the time of the exchange that they intended to keep World Wide as an operating division under the Sandia umbrella). Similarily we do not think that the so-called "rescission measure of damages" approved by several Circuit Courts [6] is technically appropriate here. According to this measure, if the actual stock or assets which were originally traded are no longer available, damages will be awarded in the amount of the difference between the present market value [7] of the consideration originally given and the consideration received. This is probably most appropriate where the consideration exchanged is tangible and has a readily ascertainable market value, where the defendant has through a transaction fraudulently induced by him received stock or assets which appreciated in value through no effort of his own, and where the stock or assets restored to the plaintiff would be of use or value to him.[8] In the instant case, however, World Wide stock is no longer in existence, and a determination of the value of a bowling business comparable to that run by World Wide before the exchange would be extremely speculative. Moreover, this is a case where the plaintiffs suffered a loss as a result of the original transaction, not where the de-

---

5. Indeed, in a situation like this where the officers of Sandia deliberately withheld many material facts in order to cast their corporation in a favorable light in making a face-to-face sale, there would seem to be good reason for applying the so-called warranty measure of damages. However, apart from the tort measure's being the traditional federal rule, courts have thus far assumed that giving the plaintiff the benefit of his bargain would contravene the limitation of § 28(a) of the Act to "actual damages." See Loss, op. cit. Vol. VI, p. 3923, citing Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 533 (10th Cir. 1962); Kohler v. Kohler, 319 F.2d 634, 7 A.L.R. 3d 486 (7th Cir. 1963).

6. Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965) cert. den. 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); Myzel v. Fields, 386 F.2d 718, 748–749 (8th Cir. 1967); Baumel v. Rosen, 283 F.Supp. 128, 145 (D.Md.1968).

7. Or the market value at some intermediate time.

8. Ibid.

fendants received an unexpected or unwarranted windfall.

Nevertheless, even though none of the remedies heretofore considered is technically applicable or will not adequately compensaate the plaintiffs for the wrong done them, for a number of reasons we think that we should modify these remedies to do equity in the circum- stances of this case. First, strict application of the remedies previously considered was rendered difficult or impracticable by the fraudulent conduct of the defendants, and not by the plaintiffs, who when they began to suspect that they had not been apprised of all of Sandia's affairs prior to the exchange, demanded an accounting and when that was not given, demanded rescission. Secondly, we are cognizant of the policy of the Federal Courts in securities cases enunciated by the Supreme Court in J. I. Case Co. v. Borak, 377 U.S. 426 at p. 433, 84 S.Ct. 1555 at p. 1560, 12 L.Ed.2d 423 (1964) that " 'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' " [9] and that " 'The power *to enforce* implies the power to make effective the right of recovery afforded by the Act. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case.' " [10]

Finally, probably because most 10b–5 cases to date have been settled or otherwise resolved at the pleading stage, the law regarding remedies is still at an inchoate stage of development. Loss, Securities Regulation, Vol. III, Ch. 11, 7 (b) (iv) p. 1792; Vol. VI, p. 1392 ff; also, Vol. 11A. Business Organizations —Securities Regulation—Gadsby, The Federal Securities Exchange Act § 5.03 [4] [c]. In the cases which have thus far reached the remedies stage, courts on several occasions have exercised equitable discretion to modify traditional remedies strictly interpreted so as to grant relief which is fair and appropriate in the circumstances before them. See generally, Note, "Measurement of Damages in Private Actions under Rule 10b–5, [1968] Wash.U.L.Q., 165, 179 and cases therein cited; also, see Bromberg, Securities Law: Fraud—SEC Rule 10b–5, Sec. 9.2, p. 231.

Under all the circumstances, we think that the most feasible and equitable means of restoring to the plaintiffs what they were deprived of by the defendants' fraud is as follows: First, the value of the World Wide stock and debentures at the time of the exchange will be determined. Then interest at the rate of 6% per year on this amount from the date of the exchange will be included. Then the plaintiffs, upon tender of their Sandia stock (including anything they may have received by virtue of being Sandia shareholders) will be entitled to receive from the defendants that portion of the determined value of World Wide stock and debentures (including interest) which corresponds to their share of Sandia stock received by World Wide shareholders and debentureholders in connection with the original exchange.

Regardless of how this adjustment is formally characterized, we think that it will as effectively as is now possible restore the parties to the position that they would have been in had there been no fraud in the first place: The plaintiffs will have the monetary equivalent of their bowling business as if they had sold it for a fair price at the time of the exchange (which is especially fair here because they were attempting to sell their business at the time of the exchange in any event) with fair interest to the present. The defendants on the other hand will have the stock which they gave to the plaintiffs in connection with the transaction so that they will be treated

---

9. Quoted from Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

10. Quoted from Deckert v. Independence Shares Corp., 311 U.S. 282, at 288, 61 S.Ct. 229, 85 L.Ed. 189 (1940).

as if World Wide had known all of the facts and rejected the Sandia offer.

■ Finally, we have concluded pursuant to Rule 53(b) that the determination of the value of the World Wide stock and debentures at the time of the initial exchange involves a "difficult computation of damages" and that a master should be appointed to make such determination and to compute the terms upon which Sandia stock will be returned to Sandia and former World Wide owners will receive the value of their previous holdings in accordance with the conditions we have just discussed. In making his determination of the value of the World Wide stock and debentures at the time of the exchange, the master should consider, but is not limited to, the following factors bearing upon the value of the World Wide enterprise: value of the assets; the value of a similar concern on the market at that time; the price bid and asked for World Wide stock and debentures, if any, at any time prior to the exchange; the value of any intangible assets such as management ability; an approximation of the reasonably expected earnings; and an appropriate rate of capitalization for World Wide. The ultimate object is to arrive at a price which World Wide stockholders and debentureholders would have received had they sold World Wide to a reasonable buyer other than Sandia as of May 14, 1962.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action.

2. The actions against Pauline Wechsler and Sigmund Goldblatt are dismissed.

3. The transaction in which World Wide shareholders exchanged their holdings for stock in Sandia American Development Corporation constituted a "purchase or sale" within Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934. Securities Exchange Commission v. National Securities et al., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 opinion delivered January 27, 1969.

4. The defendants made numerous misstatements and omitted to state to the plaintiffs many material facts relating to the financial condition, and operations, of Sandia American Development Corporation.

5. These representations were made with the intent that the World Wide shareholders rely upon them in exchanging their stock and debentures in World Wide for Sandia stock.

6. The World Wide stockholders relied on these representations.

7. These actions on the part of the defendants constitute violations of Rule 10b–5 promulgated pursuant to Section 10(b) of the Securities Exchange Act of 1934, for which the defendants, Nathan Wechsler and Sandia American Corporation, are liable to the plaintiffs, the stockholders and debentureholders of World Wide Bowling Corporation.

8. The wrong done the plaintiffs shall be redressed according to the procedure prescribed in the foregoing discussion.

## ORDER

And now, To Wit, this 12th day of September, 1969, it is ordered that judgment be entered in favor of all plaintiffs named in this action against Sandia American Corporation and Nathan Wechsler in accordance with the foregoing discussion.

It is further ordered that pursuant to Rule 53, Michael A. Macchiaroli, Esq. shall be appointed as Special Master in this action to make the determinations enumerated in the foregoing opinion.

It is further ordered that in order to indemnify the Master in the event that no fund in the custody and control of this Court is sufficient to pay his compensation and costs incurred by him, the plaintiffs shall post bond with surety with the Clerk in the sum of $2,500.00 within thirty days from this date. Failure to do so shall preclude any monetary relief in this action.