Faye GOODMAN and Thelma Makavitt

v.

Daniel DeAZOULAY and Michael Levin.

Civ. A. No. 81–2250.

United States District Court,
E. D. Pennsylvania.

June 25, 1981.

Steven M. Kramer, Robert J. Vedatsky, Philadelphia, Pa., for plaintiffs.

Steven L. Friedman, Dilworth, Paxson, Kaush & Levy, Philadelphia, Pa., for defendants.

Daniel DeAzoulay, pro se.

## MEMORANDUM AND ORDER

SHAPIRO, District Judge.

### I. INTRODUCTION

This is an action brought by Faye Goodman ("Goodman") and Thelma Makavitt ("Makavitt") against Daniel DeAzoulay ("DeAzoulay") and Michael Levin ("Levin") that arises out of proposed development of residential real estate. It is alleged that defendants conspired to defraud Goodman and Makavitt of invested funds by misrepresenting their professional experience, past projects and future prospects, and the return plaintiffs would realize on real estate investments in Margate, New Jersey and Florida (First Amended Complaint ¶ 10, ¶ 20).

Plaintiffs allege federal jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78a for claims under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b–5 promulgated by the SEC.[1] Plaintiffs also assert pendent state law claims of fraud and corporate waste. In addition to damages, they seek the dissolution of a corporation formed by Goodman, DeAzoulay and Levin, GAL Investments Ltd. ("GAL"), and the appointment of a custodian of its assets.

Plaintiffs have moved for a preliminary injunction to freeze defendants' personal assets and for the appointment of a trustee for GAL. After full consideration of the parties' memoranda and the evidence offered during a hearing which lasted five days, the motion is denied. However, the

---

1. Rule 10b–5 provides:

    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

    17 C.F.R. § 240.10b–5 (1981).

court's Order of August 4, 1981 which restrains the disposition of GAL assets absent a court order shall remain in effect.

## II. FACTS

Levin was a fifty-percent owner of a company called Land Development Network (N.T. 129 (9/23/81)); DeAzoulay was his employee. (N.T. 140 (9/23/81)). Goodman met DeAzoulay in December, 1981 (N.T. 7 (9/23/81)); she became friendly with him (N.T. 441 (10/1/81)) and interested in helping him develop real estate. (N.T. 317–18 (9/24/81)).

In January 1981, Goodman obtained a $60,000 loan secured by her personal securities from the Continental Bank. (N.T. 81, 124 (7/24/81)). Fifty thousand dollars of this money was deposited in a Philadelphia National Bank joint account in the names of Goodman and DeAzoulay. (N.T. 158 (7/24/81)). That same month, Goodman's sister, Makavitt, wired $20,000 to Goodman's personal bank account; this money was transferred before Makavitt had spoken to either of the defendants. (N.T. 13, 17 (7/23/81)). Makavitt was told by Goodman that this money was to be invested by Levin and DeAzoulay in Florida condominiums. (N.T. 82 (9/23/81)). In February, 1981, Goodman, DeAzoulay and Levin went to Israel to secure commodities contracts (N.T. 38, 39 (9/23/81)), but no contracts were executed. (N.T. 39, 40 (9/23/81)).

GAL was created sometime in February or March, 1981 (N.T. 156 (9/23/81); N.T. 318 (9/24/81)); Goodman was its president and she, Levin and DeAzoulay were each to hold a one-third interest in it. Goodman was to provide the financing and defendants the entrepreneurial and construction skills required for the joint venture. (N.T. 162 (7/24/81); N.T. 116, 117 (9/23/81)). Goodman mortgaged her home for $90,000 in March, 1981, and represented that the funds were to send a child to college (Ex. DL–1). These proceeds were placed in a GAL account at the Atlantic National Bank on which Goodman and DeAzoulay jointly signed checks. (N.T. 163 (7/24/81); Ex. P–4).

In March and April, 1981, GAL acquired two properties in Margate, New Jersey and executed a use and occupancy agreement with an option to buy a third property.[2] (Ex. DL–6, DL–8). Two of the properties acquired remain in the possession of GAL; they cost $225,000 and are encumbered by mortgages in the original amount of $163,250. (Ex. DL–9, DL–10). In May, 1981, Makavitt wired $80,000 to the GAL Atlantic National Bank account. (N.T. 23–25 (7/23/81); N.T. 85 (9/23/81); Ex. DL–12). However, $20,000 of her $100,000 expenditure was later returned to her. (N.T. 17 (7/23/81)).

## III. DISCUSSION

### A. Defendants' Personal Assets

■ The standard in this Circuit for the issuance of a preliminary injunction is settled:

... the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted.... Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court 'should take into account when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.' ...

*Constructors Association v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978) (citations omitted).

### 1. Probability of Success

The plaintiffs cannot show a reasonable probability of eventual success in the litigation with respect to one or both defendants. Goodman's action against either defendant is weak because she cannot establish a violation of the federal securities law.

■ The elements of a Rule 10b–5 securities action are (1) a violation in connection with the purchase or sale of a security (2)

---

**2.** The option on the third property expired on    October 8, 1981.

due to omission or misrepresentations which are material in the context of the transactions at issue and (3) which are causally related to the alleged injury (4) by a violator with scienter. *Dower v. Mosser Industries, Inc.,* 488 F.Supp. 1328, 1334–35 (E.D. Pa.1980), *aff'd,* 648 F.2d 183 (3d Cir. 1981).

In order for the plaintiffs to prevail under Section 10(b) they must prove that the transaction involved a security within the meaning of the Securities Exchange Act. "Security" is defined at Section 3(a)(10) of the Act as follows:

> [W]hen used in this chapter, unless the context otherwise requires—
>
> .    .    .    .    .
>
> (10) The term 'security' means any note, stock, bond, debenture, certificate of interest or participation in any profit sharing agreement . . . investment contract . . . or in general, any instrument commonly known as a 'security' . . . .

15 U.S.C. § 78c(a)(10).

Although the parties formed a corporation in which they were each to hold "stock" and would therefore appear to be covered by Section 3(a)(10) of the Act,

> . . . the Supreme Court of the United States in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d [621] 62 (1975), has made it clear that not all sales transactions which involve 'stock' are necessarily covered by the Act. . . . the *Forman* Court states the 'basic principle' that 'in searching for the meaning and scope of the word 'security,' form should be disregarded for substance *and the emphasis should be on economic reality.'* (emphasis supplied *id.* citing *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). . . .

The 'economic reality' test enunciated in *Forman, supra,* incorporates, as one of its three elements, the language of the leading case of *SEC v. W. J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed.2d 1244 (1946). The *Howey* case provides the test for deciding whether a particular transaction constitutes an 'investment contract,' which is a security within the meaning of the Act, or a commercial transaction, which is not a security under the Act. According to the *Howey* Court, the test for distinguishing an investment contract from a mere commercial or consumer transaction is 'whether the scheme involves an investment of money in a common enterprise with profits to come *solely from the efforts of others."* (emphasis supplied) 328 U.S. at 301, 66 S.Ct. at 1104.

*Pallastrone, et al. v. Blimpie Industries, Ltd., et al.,* Civil Action No. 79–3328, Broderick, J., Memorandum, filed December 9, 1981, at 4–5.

The three elements of the "economic reality" test required to establish the applicability of the Act are: 1) an investment in a common venture; 2) premised on a reasonable expectation of profit; and 3) the profit is to be derived from the entrepreneurial or managerial efforts of others. *Forman, supra,* 421 U.S. at 852–53, 95 S.Ct. at 2060–61 (footnotes omitted). In applying this test to the material facts, the court concludes Goodman did not expect profit solely from the entrepreneurial or managerial efforts of others but her profit was to be derived from a joint venture in which she herself was a participant with Levin and DeAzoulay on an equal basis. The one-third interest in GAL that Goodman acquired was not a purchase by her or a sale by Levin and DeAzoulay of a "security" within the meaning of the Act. *See, Pallastrone, supra.*

Goodman and DeAzoulay shared a close relationship. Goodman often visited DeAzoulay's office at Land Development Network, Ltd. (N.T. 296, 297 (7/24/81)). Goodman allowed DeAzoulay to use her American Express card for his personal expenditures. (N.T. 9–10 (7/23/81)). Goodman and DeAzoulay opened a joint bank account in their names (N.T. 158 (7/24/81)) and she and DeAzoulay jointly signed checks from that account. (Ex. P–4).

The testimony proves Goodman an active participant in and beneficiary of GAL activities. She testified "[t]he company is me." (N.T. 63 (7/23/81)). She was President of GAL. (N.T. 162 (7/24/81)). She drew a GAL salary. (N.T. 153 (7/24/81)). GAL

bank account statements were sent to her home address. (N.T. 168 (7/24/81)). She and DeAzoulay jointly signed checks from the GAL bank account. (Ex. P–4). She used GAL monies to pay her personal American Express bills and to purchase for her use and that of DeAzoulay two Cadillac Sevilles. (N.T. 56, 58 (7/23/81); 122–23 (9/24/81)). This personal use of GAL money and participation in GAL activities evidences Goodman's active control of her investment. She did not invest money expecting profits solely from the efforts of others. Goodman has not established the purchase or sale of a security because in economic reality she invested in GAL as a joint venturer.

Goodman's actions are those of an active, knowing, perhaps foolhardy, venturer, not of a "naive widow" victimized by a "swindle." (Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction).[3] If anything, the parties victimized each other. Goodman, bequeathed substantial assets in trust by her deceased husband, led defendants to believe she had many real estate investments and assets sufficient to be the financial support of their venture; DeAzoulay and Levin misunderstood the limitations on plaintiffs' financial resources because of Goodman's conduct.

■ Makavitt's investment, unlike Goodman's, was premised on the managerial or entrepreneurial efforts of others, so that Makavitt could establish a purchase or sale of a security. But there is simply no evidence that Levin made *any* misrepresentation to her. She testified that she spoke to neither Levin nor DeAzoulay prior to the $20,000 transfer to Goodman in January, 1981 (N.T. 13, 17 (7/23/81)). Prior to her $80,000 transfer in May, 1981, she testified that she clearly remembered several conversations with DeAzoulay by telephone and their substance (N.T. 21 (7/23/81)), but she could not clearly remember either speaking to Levin or the substance of such a conversation if indeed it took place. (N.T. 35 (7/23/81)). Without evidence of misrepre-

sentations, her claim against Levin for securities fraud must fail.

■ Makavitt's common law fraud claim suffers a similar defect. "The basic prerequisite of an action in deceit for fraudulent misrepresentations is that the deceiver shall *knowingly* make a false statement, *intending* the actor to rely upon it to his detriment . . . ." *Linda Coal and Supply Co. v. Tasa Coal Co.*, 416 Pa. 97, 204 A.2d 451, 454 (1964); *accord, U. S. Gypsum Co. v. Schiavo Bros., Inc.*, 450 F.Supp. 1291 (E.D. Pa.1978); *aff'd in part and rev'd in part on other grounds*, 668 F.2d 172 (3d Cir. 1981). Fraud or intent to defraud must be proven by evidence that is clear, precise and convincing. *Beardshall v. Minuteman Press International, Inc.*, 664 F.2d 23 (3d Cir. 1981). No such evidence was adduced by Makavitt.

■ Makavitt argues that Levin is liable as an aider and abettor of DeAzoulay's misrepresentations. (Supplemental Memorandum No. 2 at 15). However, assuming *arguendo* that DeAzoulay committed a securities violation, there is little evidence that Levin had knowledge of DeAzoulay's actions *and* "knowingly and substantially" participated in the wrong-doing. *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir.), *cert. denied sub nom., First Pennsylvania Bank N. A. v. Monsen*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). The testimony of Goodman on which Makavitt relies in support of her aiding and abetting theory (Plaintiffs' Supplemental Memorandum No. 2 at 15–20), is inconclusive as to Levin's participation, if credible.

Makavitt did remember having telephone conversations with DeAzoulay before she wired $80,000 to the a GAL bank account. (N.T. 11, 13 (7/23/81); N.T. 347 (11/1/81)). She claims DeAzoulay stated that the New Jersey condominiums were presold or under contractual commitment and that she would realize a $12,000 per year return on her investment. (N.T. 11, 15 (7/23/81)). Her

---

**3.** The testimony of Ms. Millie Korn, who plaintiffs offered as another potential "victim" of DeAzoulay's schemes, hardly counters this pattern of active collaboration between Goodman and DeAzoulay. It is noted that Korn "walked away" from DeAzoulay after several conversations. (N.T. 461 *et seq.* (10/1/81)).

probability of success on the merits against DeAzoulay is also enhanced by the fact that DeAzoulay invoked his Fifth Amendment privilege during a discovery deposition with respect to the disposition of $25,000 which he withdrew from the PNB bank account.[4] (*See also*, N.T. 348–60 (11/1/81)). By Order dated November 16, 1981, the court granted plaintiffs' motions for sanctions and precluded DeAzoulay from introducing any evidence at trial relating to matters as to which he invoked the Fifth Amendment.

However, Goodman appears to be equally culpable in these matters. It was Goodman who told Makavitt that she was enthused about the Margate property (N.T. 45 (7/23/81)); it was Goodman who introduced DeAzoulay to Makavitt before their first telephone conversation (N.T. 68 (7/23/81)); and DeAzoulay denies that Goodman told him about Makavitt's initial $20,000 "investment." (N.T. 360 (10/1/81)). This denial is consistent, at least, with the fact that it was Goodman alone who induced Makavitt to wire that money to Goodman's personal bank account. (N.T. 13, 17 (7/23/81)).

■ It is undisputed that Levin requested that Goodman obtain her own lawyer to draft a shareholder agreement regarding the activities of GAL and a loan agreement regarding the investment of Makavitt. (N.T. 88, 89 (9/23/81); 443–44 (10/1/81)). Sending plaintiffs to a lawyer of their own choice for their protection is clearly inconsistent with plaintiffs' allegation that Levin conspired to defraud.[5]

In evaluating credibility, the court finds Goodman least credible and Makavitt most credible. Levin, while perhaps not telling the entire story, seemed to conceal less than DeAzoulay and Goodman. In light of plaintiff Goodman's non-responsive and evasive testimony on both direct and cross-examination, it cannot be said that the probability of proving securities or common law fraud at trial is "reasonable."

### 2. Irreparable Harm

■ Neither Makavitt nor Goodman has shown that irreparable harm would flow from the failure to freeze defendants' assets *pendente lite*. Plaintiffs assert that because GAL is insolvent, such a freeze is necessary to ensure satisfaction of their prospective judgment. (Plaintiffs' Supplemental Memorandum No. 2). This position is without substantial support in the record. GAL owns bayside properties in Margate, New Jersey, in which its equity is in excess of approximately $60,000. These assets constitute protection for the plaintiffs, particularly Makavitt.[6] Also, plaintiffs have made no showing that Levin, the only defendant with assets, is in the process of liquidating or otherwise transferring his personal assets in fraud of creditors or fleeing the jurisdiction. The Court of Appeals has stated that "[t]he injury contemplated by the denial of a preliminary injunction must be actual and of serious consequence, not merely theoretical." *A. L. K. Corp. v. Columbia Pictures Industries, Inc.*, 440 F.2d 761, 764 (3d Cir. 1971). The record does not

---

4. The PNB account was opened by Goodman and DeAzoulay on February 4, 1981 in the amount of $67,000. (N.T. 350 (10/1/81); Ex. P–11). On that day, Goodman and DeAzoulay signed a check for $25,000 of which PNB was the payee, and PNB issued two cashier's checks to DeAzoulay in the amounts of $20,000 and $5,000. (Ex. P–13, P–14). DeAzoulay testified that the two cashier's checks were cashed in Israel with the help of Levin but he refused to divulge the disposition of those monies. (N.T. 353 (10/1/81)). The $25,000 check to PNB (Ex. P–11) and the check register for the PNB account (Ex. P–15) indicate that Ed "Goldstein" or "Gastein" was to receive the money. (*See*, N.T. 358–60 (10/1/81)).

5. Plaintiffs offered the expert testimony of Mr. Maury Rosenberg, most of whose professional experience was in commercial as opposed to

residential real estate development (Ex. P–10; N.T. 266 (9/24/81)), in an effort to show that Levin's Margate proposal was so unrealistic that intent to defraud must be fairly inferred. However, the plans which Rosenberg evaluated were not what Levin had proposed. (Compare N.T. 270 *et seq.* with 244–52 (9/24/81)). Rosenberg's criticism of Levin's plan did not convince the court that Levin's confidence in his plan was unreasonable or that the plan was inevitably doomed to failure had Goodman's investment been expended on real estate development by GAL instead of personal luxuries by Goodman and DeAzoulay.

6. As discussed above, Makavitt's claims against DeAzoulay in the amount of $80,000 enjoy a reasonable probability of eventual success on the merits; Goodman's do not.

support injury to plaintiffs of an "actual and serious consequence."

The court is obligated to take into account the possibility of harm to the defendants if their personal assets were to be frozen by court order. *See, Constructors Association, supra* at 815. In this case, such an order would hinder Levin's ability to pursue his real estate business interests and DeAzoulay's ability to seek employment. Both Levin and DeAzoulay have asserted counterclaims for securities law violations and fraud against Goodman. Levin has also filed a third-party complaint against Goodman for contribution or indemnity should he be found liable to Makavitt. In this posture, it is hardly just to freeze the personal assets of either DeAzoulay or Levin.

The parties have not brought to the court's attention the possibility of harm to other interested persons from the grant or denial of this motion; this case does not seem to implicate any public interest. *Id.* Balancing the above factors, as the court must do on a motion for preliminary injunction, we find that the plaintiffs' showing is not sufficient to order a restraint on defendants' use or disposition of personal assets.

## B. *GAL Assets*

Plaintiffs also move the court to appoint "a trustee to safeguard the assets of the corporation, and to prevent the defendants from dissipating those assets." (Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction at 5). The standard for exercising such an equitable remedy resembles that for a preliminary injunction.

> The appointment of a receiver is a matter within the sound discretion of the court, and each case must be determined upon its own conditions and circumstances, and in exercising this right the courts should ever keep in mind that a receiver is, *like an injunction, an extraordinary remedy, and ought never be made except in cases of necessity, and upon a clear and satisfactory showing that the emergency exists, in order to protect the interests of the plaintiff in the property involved.* The power of appointing receivers is one which the courts have said should be *sparingly exercised, and with great caution and circumspection.* (Emphasis added).

*Rumbaugh v. Beck,* 491 F.Supp. 511, 520 (E.D.Pa.), *aff'd mem.,* 636 F.2d 1210 (3d Cir. 1980) (*citing Miller v. Fisco, Inc.,* 376 F.Supp. 468, 470 (E.D.Pa.1974) (Emphasis original)).

No such emergency can exist in this case, for pursuant to this court's order of August 4, 1981, the remaining assets of GAL cannot be sold or otherwise used without the court's approval. The corporate assets are sufficiently protected as plaintiffs' counsel conceded at closing arguments. Plaintiffs' motion for the appointment of a trustee is denied.