Faye GOODMAN and Thelma Makavitt

v.

Daniel DeAZOULAY and Michael Levin.

Civ. A. No. 81–2550.

United States District Court,
E.D. Pennsylvania.

Jan. 11, 1983.

Steven M. Kramer & Robert J. Vedatsky, Philadelphia, Pa., for plaintiffs.

Steven L. Friedman, Dilworth Paxon Kalish & Levy, Philadelphia, Pa., for Michael Levin.

Barry F. Greenberg, Philadelphia, Pa., for Daniel DeAzoulay.

MEMORANDUM and ORDER

SHAPIRO, District Judge.

## I.  INTRODUCTION

In this action Faye Goodman ("Goodman") and Thelma Makavitt ("Makavitt") claim damages from Daniel DeAzoulay

("DeAzoulay") and Michael Levin ("Levin") arising out of their investment for the proposed development of real estate. They allege that defendants conspired to defraud them of the funds they invested by misrepresenting defendants' professional experience, past projects and future prospects, and the projected return from their real estate investments in Margate, New Jersey and Florida (First Amended Complaint ¶ 10, ¶ 20).

Plaintiffs allege federal jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78a for claims under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b–5 promulgated by the SEC. (Counts I, II). Plaintiffs also claim a violation of § 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l* (both the 1934 and 1933 laws hereinafter termed "the Acts").[1] Plaintiffs assert pendent state law claims of fraud (Count III) and corporate waste (Count IV). In addition to damages, they seek dissolution of a corporation formed by Goodman, DeAzoulay and Levin, GAL Investments Ltd. ("GAL") (Count VI), and the appointment of a custodian of its assets (Count V).

Plaintiffs previously moved for a preliminary injunction to freeze defendants' personal assets and for the appointment of a trustee for GAL. After a hearing which lasted five trial days, this motion was denied. *Goodman v. DeAzoulay,* 539 F.Supp. 10 (E.D.Pa.1982). An appeal of that denial was later withdrawn. Defendant Levin now moves for summary judgment against both plaintiffs on all counts. Our prior Opinion reviews the facts of this case. *See, Goodman, supra* at 13. For the reasons discussed below, Levin's motion for summary judgment is granted in part and denied in part.

## II. DISCUSSION

The standard of review of a motion for summary judgment differs from that of a motion for the extraordinary equitable relief of a preliminary injunction. In our prior opinion, we decided that neither Goodman nor Makavitt had demonstrated a "reasonable probability of eventual success," *Constructors Ass'n. v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978), against Levin on either the then pending federal securities claims[2] or common law fraud claims. *Goodman, supra* at 13–16. On a motion for summary judgment we must decide whether there can fairly be said to be a dispute with regard to any material facts and, if not, whether the moving party is entitled to a judgment as a matter of law. *See,* Fed.R. Civ.P. 56(c). Doubts as to the existence of genuine issues of fact are to be resolved against the party moving for summary judgment. *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 506 (3d Cir. 1981). As non-movants, Goodman and Makavitt are entitled to the benefit of all reasonable inferences from the record. *Id.* However, Goodman and Makavitt must produce "significant probative evidence tending to support the complaint" or suffer entry of summary judgment. *Mogul v. General Motors Corp.,* 391 F.Supp. 1305, 1307 (E.D.Pa.), *aff'd mem.,* 527 F.2d 645 (3d Cir.1976). Conjecture or general denials will not suffice to avoid summary judgment. *United States v. Donlon,* 355 F.Supp. 220, 225 (D.Del.), *aff'd mem.,* 487 F.2d 1395 (3d Cir.1973); *Tripoli Co. v. Wella Corp.,* 425 F.2d 932, 935 (3d Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

### A. *Goodman's Securities Fraud Claims against Levin*

We earlier held that Goodman had no reasonable probability of prevailing on her securities fraud claims because her transactions with Levin did not involve a purchase or sale of a security within the meaning of the 1934 Act. *Goodman, supra* at 14–15.

---

1. By Orders dated July 13, 1982, the court granted plaintiffs' motion to amend the complaint to state a 1933 Act claim and simultaneously dismissed a related case which assert-
ed that claim. *See, Makavitt v. DeAzoulay,* No. 82–1744 (E.D.Pa. dismissed July 13, 1982).

2. Plaintiffs' 1933 Act claim was alleged after that motion was decided.

Levin's motion for summary judgment on Goodman's securities fraud claims must now be granted, for the undisputed facts demonstrate that Goodman did not participate in the purchase or sale of a security but "in economic reality she invested in GAL as a joint venturer." *Id.*

■ The definition of "security" in the Securities Exchange Act of 1934 is broad.[3] It was meant to include " 'the many types of investments that in our commercial world fall within the ordinary concept of a security.' " *Marine Bank v. Weaver,* 551 U.S. 455, 102 S.Ct. 1220, 71 L.Ed.2d 409, 414 (1982) (*quoting* H.R.Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)). Section 3(a)(10) provides:

> (a) When used in this chapter, unless the context otherwise requires—
> (10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity is likewise limited.

The definition includes "ordinary stocks," *Marine Bank, supra,* 455 U.S. at 555, 102 S.Ct. at 1223, 71 L.Ed.2d at 414, unless, as the statute provides, the context otherwise requires. *Id.,* 455 U.S. at 556, 102 S.Ct. at 1223, 71 L.Ed.2d at 415. "Congress ... did not intend to provide a broad federal remedy for all fraud." *Id.*

In a series of cases, the Supreme Court has delineated the contours of the term "security." *S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (sale of leasehold subdivisions in conjunction with promised exploration for oil, *held* "security"); *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) (sale of units of citrus grove development coupled with contract for cultivating marketing and remitting the net proceeds to the investor, *held* "security"); *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (withdrawable capital shares of a savings and loan association, *held* "security"); *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (shares of stock entitling purchaser to lease an apartment, *held* not "security"); *Marine Bank, supra* (certificate of deposit pledged to issuing bank to secure loan to a corporation and contract with corporation for benefits including portion of profits in return for providing collateral, *held* not a "security"). A persistent theme in these cases is that form is to be disregarded for substance and that analysis should focus on economic reality in searching for the scope of the term "security." *See, e.g., Tcherepnin, supra* 389 U.S. at 336, 88 S.Ct. at 553. The Court has explicitly rejected the suggestion that the sale of shares of "stock" constitute a securities transaction simply because the statutory definition of security includes the word stock. *United Housing, supra* 421 U.S. at 848, 95 S.Ct. at 2058. The name given to an instrument is not "wholly relevant" to the decision whether it is a security, *e.g.,* when the use of a name such as "stock" will lead a purchaser to assume that the federal securities laws are applicable, because "the underlying transaction embodies some of the significant characteristics typically associated with the named instrument." *Id.* 421 U.S. at 851, 95 S.Ct. at 2060. However, the true test of a "security" is:

---

**3.** The definition of security in the 1934 Act is essentially the same as that in the Securities Act of 1933, 15 U.S.C. § 77b(1). *United Hous-*

*ing Foundation, Inc. v. Forman,* 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2057 n. 12, 44 L.Ed.2d 621 (1975).

... [a] the presence of an investment in a common venture [b] premised on a reasonable expectation of profits [c] to be derived from the entrepreneurial or managerial efforts of others.

*Id.* 421 U.S. at 852, 95 S.Ct. at 2060; *Howey, supra* 328 U.S. at 301, 66 S.Ct. at 1104. These "essential attributes ... run through all of the Court's decisions defining a security." *United Housing, supra* 421 U.S. at 852, 95 S.Ct. at 2060.

A recent split panel decision of the Second Circuit bifurcated the Supreme Court's "economic reality" analysis. *Golden v. Garafalo,* 678 F.2d 1139 (2d Cir.1982). The court held that conventional stock in a business corporation is a "security" within the meaning of the 1933 and 1934 Acts whether or not the underlying transaction involves the sale of a business to one who intends to manage it actively.[4] The *Golden* court found that the first step of the analysis is to determine whether the investment in question has the characteristics usually associated with stock: right to dividends, transferability, right to pledge, voting rights in proportion to shareholdings, and ability to appreciate in value. *Golden, supra* at 1144. If by virtue of these indicia, the "legal status" of the instrument is that of "stock," economic reality is irrelevant. *Id.* Only where these indicia are absent, *e.g.,* where the instrument is unique or idiosyncratic, would the three-pronged test of economic reality come into play. *Id.*

We agree with Judge Lombard, dissenting in *Golden,* that these conclusions misread the statute and *United Housing.* The definition of security in the statute is prefaced by the clause "unless the context otherwise requires." 15 U.S.C. § 77(b)(1). *United Housing* did analyze the stock shares there involved both in terms of legal characteristics and economic reality, but in no place did it endorse the two-step, *seriatim* test of *Golden.* It noted that the shares at issue did not have the characteris-

tics commonly associated with stock *to make the point that:* "[i]n short, inducement to purchase was solely to acquire subsidized low-cost living space; it was not to invest for profit." *United Housing, supra* 421 U.S. at 851, 95 S.Ct. at 2060. In other words, one prong of the *Howey* test, a reasonable expectation of profits, was absent.

When the Supreme Court considered an alternative argument that these shares, if not stock, were investment contracts within the meaning of the Acts, the Court stated: "In considering these claims we *again* must examine the substance—the economic realities of the transaction—rather than the names that have been employed by the parties." *Id.* 421 U.S. at 851–52, 95 S.Ct. at 2060 (emphasis supplied). The use of the word "again" can only mean that the economic reality analysis *also* applied to analysis of the claim that these stock shares were "stock" within the meaning of the Acts.

We hold that Goodman did not acquire security because her transaction with Levin failed on still another of the *Howey* prongs: she was not relying on the entrepreneurial or managerial efforts of others. In *Lino v. City Investing Co.,* 487 F.2d 689 (3d Cir. 1972), the Third Circuit applied the *Howey* economic reality test and found that certain franchise agreements were not securities within the meaning of the Act. The court held that where an investor is required to perform more than "nominal or limited [duties which have] 'little direct effect upon receipt by the participants of the benefits promised by promoters,'" a security does not exist. *Id.* at 692–93.

In *Pallastrone v. Blimpie Industries, Ltd.,* No. 79–3328 (E.D.Pa.1981), plaintiffs' purchase of fifty percent of the outstanding common stock of a corporation was held not to be the purchase of a "security" because the plaintiffs bought the stock for the purpose of owning a one-half interest in a

---

4. Other Circuits have split on the validity of the sale of business doctrine. *Compare Golden, supra; Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202 (4th Cir.) *cert. denied,* 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979) *with Freder-*

*iksen v. Poloway,* 637 F.2d 1147 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); *Chandler v. Kew, Inc.,* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,966 (10th Cir.1977).

business they intended to operate and manage. *Slip Op.* at 6–7. Therefore, the third prong of the *Howey* test was not satisfied. *Accord, Somogyi v. Butler,* 518 F.Supp. 970, 982–985 (D.N.J.1981); *Anchor-Darling Industries, Inc. v. Suozzo,* 510 F.Supp. 659, 662–666 (E.D.Pa.1981). *Contra Mifflin Energy Sources, Inc. v. Brooks,* 501 F.Supp. 334 (W.D.Pa.1980); *Bronstein v. Bronstein,* 407 F.Supp. 925 (E.D.Pa.1976).

Plaintiff cites *Glick v. Campagna,* 613 F.2d 31, 35 (3d Cir.1979) for the contrary proposition. In *Glick,* plaintiff and defendant each owned fifty percent of the stock in a computer leasing corporation. On the basis of defendant's representation, plaintiff sold his stock to him at low value. Judgment for plaintiff was affirmed. In its Opinion the court stated:

Preliminarily we note that the stock involved here was that of a small, private corporation, neither registered on any national securities exchange nor required to file reports with the SEC. But despite Campagna's argument that he and Glick were in reality partners and the transaction was only the sale of a partnership interest, the trial judge properly found that WMFI had conducted its business as a corporation and the sale, in fact, had been of a security. The court was not incorrect in so ruling.

The court continued in a footnote:

The author of this opinion is not wholly persuaded that the regulation of small companies, such as WMFI, was intended by the drafters of the Securities Exchange Act. The stock of small, close corporations, such as WMFI here, Duralite in *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir.1975), and a similar-sized operation in *Rochez Bros., Inc. v. Rhoades,* 491

F.2d 402 (3d Cir.1973), is not the subject of the market manipulation that Congress sought to curtail when it enacted the securities laws. Nevertheless, a literal reading of the statute and governing precedent require that we now consider this case on the merits. *See* Note, A New Approach To Rule 10b–5: Distinguishing The Close Corporation, 1978 Wash.U.L.Q. 733, 750.

*Id.* at 35. But even if the authority of *Glick* remains intact after *Marine Bank, supra,* it does not control this case. *Glick* does not reject an economic reality analysis; it simply denies defendant's version of that reality, *i.e.,* that plaintiff was an active business partner of defendant who sold a partnership interest. Plaintiff was a director of the company who spent most of his time at another job; defendant was the salaried president of the company who devoted all of his time to the corporation. *Id.* at 33. Goodman's position here is totally distinguishable.[5]

GAL is a Pennsylvania corporation. (First Amended Complaint and Answer, ¶ 8). Its function was discussed a few days prior to February 6, 1981. (N.T. 156–57 9/23/81; 318–19 9/24/81). The date of incorporation does not appear of record but a GAL bank account at the Atlantic National Bank was opened in March, 1981. (N.T. 163 7/24/81; Ex. P–4).[6] GAL's articles of incorporation were not offered in evidence so we do not know whether the provisions of the Pennsylvania Close Corporations laws are applicable. *See* 15 Pa.Cons.Stat.Ann. § 1371 *et seq.* (Purdon). Levin denies in his answer that any shares of GAL were purchased by plaintiffs and nothing of record indicates that share certificates were ever

---

**5.** *Glick* does not suggest that the Third Circuit would accept the *Golden* bifurcated analysis. The court's focus, demonstrated by its footnote, was on the merits of regulating close versus public corporations. *See generally, Marine Bank, supra.* Even *Golden* prefaces its citation to *Glick* with "see also." *Golden, supra* at 1142 n. 4.

A recent Third Circuit securities case endorses the economic reality test without reference to either *Golden* or *Glick. Salcer v. Merrill*

*Lynch, Pierce, Fenner and Smith,* 682 F.2d 459 (3d Cir.1982). Finally, three post-*Glick* decisions in this Circuit adopt the position here taken without reference to *Glick. See, Pallastrone, supra, Samogyi, supra,* and *Anchor-Darling, supra.*

**6.** Levin alleges in a brief that GAL was incorporated on March 11, 1981. This is plausible but Levin makes no citation to the record for this fact and we find none.

issued or signed, that by-laws were adopted or that corporate meetings were held.[7]

The undisputed testimony and documentary evidence proves Goodman an active participant in and beneficiary of GAL activities. She testified "[t]he company is me." (N.T. 63 7/23/81). She was President of GAL. (N.T. 162 7/24/81). She drew a GAL salary. (N.T. 153 7/24/81). GAL bank account statements were sent to her home address (N.T. 168 7/24/81). She and DeAzoulay jointly signed checks from the GAL bank account. (Ex. P–4). As GAL president, she signed property use and occupancy agreements, settlement statements and mortgage notes. (Ex. DL–6–10). As GAL president, she received a letter from a New Jersey attorney regarding the development of the New Jersey properties. (Ex. DL–11). She used GAL monies to pay her personal American Express bills and to purchase two Cadillac Sevilles for her use and that of DeAzoulay. (N.T. 56, 58 7/23/81; N.T. 122–23 9/24/81). In addition, Goodman and DeAzoulay shared a close relationship. Goodman often visited DeAzoulay's office at Land Development Network, Ltd. (N.T. 296–97 7/24/81). Goodman allowed DeAzoulay to use her American Express card for his personal expenditures. (N.T. 9–10 7/23/81). Goodman and DeAzoulay opened a joint bank account in their names (N.T. 158 7/24/81) and she and DeAzoulay jointly signed checks from that account. (Ex. P–4).

■ This personal use of GAL money and participation in GAL activities evidence Goodman's active control of her investment. She did not invest money expecting profits primarily from the efforts of others. Goodman has not established the purchase or sale of a security because in economic reality the undisputed facts show that she invested in GAL as a joint venturer. In applying the economic reality test to the undisputed material facts, the court concludes Goodman did not expect profit predominantly from the entrepreneurial or managerial efforts of others but her profit was to be derived from a joint venture in which she herself was an active participant who had more than nominal duties. The one-third interest in GAL that Goodman acquired was not a purchase by her or a sale by Levin and DeAzoulay of a "security" within the meaning of the Act. *See, Pallastrone, supra*. On Goodman's federal securities claims against Levin summary judgment will be granted in favor of Levin and against Goodman. Employing the same analysis, we will order summary judgment against Goodman on her federal securities claims against DeAzoulay.

**B. *Makavitt's Federal Securities Claims***

■ Makavitt's investment, unlike Goodman's, was premised on the managerial or entrepreneurial efforts of others, so by the test of economic reality, Makavitt established a purchase or sale of a security. We found earlier that there was simply no evidence that Levin made any misrepresentation to her, for Makavitt testified that she spoke neither to Levin nor DeAzoulay prior to the $20,000 transfer to Goodman in January, 1981. (N.T. 13, 17 7/23/81). Prior to her $80,000 transfer in May, 1981 to the GAL bank account, she testified that she clearly remembered several conversations with DeAzoulay by telephone and their substance (N.T. 21 7/23/81), but she could not clearly remember either speaking to Levin or the substance of such a conversation if indeed it took place. (N.T. 35 7/23/81). Summary judgment against Makavitt might have been granted on those facts.

■ However, in a subsequent discovery deposition of Makavitt, noticed by counsel

---

**7.** We do not suggest that failure to accomplish any of these acts constituted a fatal flaw in GAL's corporate formation. There is no support for that proposition in Pennsylvania law. *Wagner v. Wagner*, 466 Pa. 532, 353 A.2d 819, 824 (1976). If a certificate of incorporation had been issued, and we take this as fact because Levin has admitted GAL's corporate existence, then the existence of the corporation cannot be challenged. 15 Pa.Cons.Stat.Ann. § 1207 (Purdon).

However, the way in which the parties conducted business bears on our determination of whether there exists a securities transaction within the meaning of the Acts. (N.T. 23–25, 7/23/81; N.T. 85 9/23/81; Ex. DL–12).

for defendant Levin, Makavitt stated that upon "reviewing [her] memory," she recalled that Levin had called her before she wired $80,000 to GAL and urged her to send money in order to "close" on a larger parcel of land in New Jersey. (Makavitt Deposition 18–26, 38–39, and 53–54). While Levin's alleged statements may or may not have been misrepresentations, they do link him to a series of conversations between Makavitt and Goodman and DeAzoulay and might support an aiding and abetting theory of liability. *See, Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 799 (3d Cir.), *cert. denied sub nom. First Pennsylvania Bank NA v. Monsen,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). Makavitt's assertion of refreshed memory raises an issue of credibility which ought not be decided on a motion for summary judgment.

Levin contends that he cannot be liable to Makavitt under the Acts because he never proposed that she purchase a security and that her investment did not, in fact, constitute a security. Levin's counsel argues that because Levin had "no idea what sort of agreement plaintiff Makavitt would strike," there was lacking a crucial connection between Levin's solicitation and the sale of a security. But *cf., Mason v. Unkeless,* 618 F.2d 597 (9th Cir.1980). However, there was no such ambiguity in Levin's mind; he thought that this 62 year old Georgia widow, whose sole source of income apart from her life savings was her Social Security entitlement, had made an unsecured loan of $80,000 to GAL. (N.T. 126 9/23/81). Makavitt thought she was receiving a limited partnership, although she had little knowledge of what that phrase meant, and she was certain that her investment was not merely a loan. (N.T. 21–22 7/23/81). The testimony of Makavitt and Levin, separately and in juxtaposition, raise credibility issues. Since Makavitt has submitted an affidavit, untested by cross-examination, in which she recalls speaking with Levin (after the court's written opinion denying preliminary relief), viewing the evidence and the inferences therefrom in the light most favorable to the non-movant, we do not grant summary judgment for Levin on Makavitt's

federal securities claims on the ground that no security was involved.

■ In addition, we will not dismiss Makavitt's 1933 Act claim on the ground that her transaction falls within that Act's private offering exemption as Levin contends. *See,* 15 U.S.C. § 77d(2). Whether an offering is public or private is a question of fact which depends on the totality of circumstances in light of the statutory purpose. *See, SEC v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). "The design of the statute is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *Id.* at 124.

Rule 146, promulgated by the SEC, states that in order to be considered a private offering, the offering must be: (1) not made by general solicitation or general advertising; (2) made only to persons whom the offeror believes have such knowledge and experience which would enable them to evaluate the risks of the investment; (3) made only to persons whom the offeror believes can bear the economic risk of investment; and (4) made only to persons who have access, by means of an employment or family relationship or economic bargaining power with respect to the offeror, to the same type of information as would be contained in a registration statement. 17 C.F.R. § 230.146 (1982). Courts have adopted a four-factor analysis which tracks the SEC's rule. These factors are: (1) the number of offerees and their relationship to the issuer; (2) the number of units offered; (3) the size of the offering; and (4) the manner of the offering. *See, e.g., Mary S. Krech Trust v. Lakes Apartments,* 642 F.2d 98, 101 (5th Cir.1981).

While Makavitt's transaction bears many of the earmarks of a private offering, *e.g.,* personal telephoned solicitation, sole offeree, access to information by virtue of economic leverage and family relationships, we cannot grant summary judgment on her 1933 Act claim because the record is silent as to the GAL principals' *reasonable* knowledge and belief about Makavitt's financial

acumen and her ability to bear the economic risk of her investment. Indeed, given Goodman's close familial relationship to Makavitt and the prominent role Goodman played in inducing Makavitt to invest her life savings (whatever she believed about Levin and DeAzoulay), it may be fairly inferred that it was *unreasonable* for Goodman to believe that Makavitt had either the resources or the skills necessary to make this investment. On the present state of the record, summary judgment on Makavitt's 1933 Act claims will be denied.

## C. *Goodman and Makavitt's Common Law Fraud Claims*

Plaintiffs allege in their Complaint that the defendants made the following misrepresentations to them:

Regarding investment in GAL:

1. Levin's relatives would invest $150,000 in GAL;

2. Goodman, for her investment, would have a one-third interest in forty condominium units in Margate, New Jersey;

3. Levin and DeAzoulay were experienced real estate developers who had:
   a. offices in several Delaware Valley locations;
   b. commenced construction of a large development in Israel;
   c. purchased a large building in Atlantic City for condominium conversion; and
   d. a good credit rating;

4. They would reap substantial profits from executed coal and chicken commodities deals;

5. They would make substantial profits and would receive income equal to double their investment; and

6. Levin and DeAzoulay had been awarded a contract to renovate a Philadelphia hotel. (Complaint at ¶ 10).

Regarding limited partnership in Florida condominiums:

1. Levin and DeAzoulay had additional funds to complete the project;

2. They guaranteed a safe return on investment;

3. They were experienced real estate developers;

4. The limited partnership would purchase the condominiums at a bargain rate. (Complaint ¶ 20).

■ Substantial factual disputes exist over who said what to whom at what time. In actions for common law fraud, these facts are obviously material. Where, as here, much will depend on the credibility of the principals as they recount their stories to the jury, we cannot grant Levin summary judgment.

■ Levin contends that the sole *direct* statement he is alleged to have made to Makavitt, *see, infra,* was not a misrepresentation. This is a disputed issue of material fact. Moreover, under the common law of fraud, a person may be liable if he authorized another person to make the fraudulent misrepresentation or in some way participated therein. *Auto Transit Co. v. Koch,* 71 Pa.Super. 171, 175–78 (1919). Conversely, representations made to one party with the intent that they be communicated to another may properly be relied on by the latter. *Jamestown Iron & Metal Co. v. Knofsky,* 291 Pa. 60, 139 A. 611 (1927); Restatement (Second) of Torts § 533 (1977). If Goodman is believed, she was merely the conduit to Makavitt for the alleged misrepresentations of Levin and DeAzoulay. This credibility issue cannot be resolved by a summary judgment.

However, we can clarify these issues for trial. Our review of Makavitt's testimony at the preliminary injunction hearing and deposition reveals the following alleged misrepresentations to her before she wired $80,000 to the GAL bank account:

1. DeAzoulay told her that the condominiums in New Jersey were pre-sold or committed. (N.T. 11 7/23/81);

2. DeAzoulay promised her a $12,000 per year income on her investment. (N.T. 15 7/23/81).

3. Levin and DeAzoulay urged her to send the money because it was needed for closing a larger parcel of land

in Margate, New Jersey. (Dep. at 16, 18–26, 38–39, 53–54);

4. Goodman told her both defendants had fine financial backing. (Dep. at 11).

5. DeAzoulay told her that other development money would come from Levin and his sources. (Dep. 34);

6. Goodman told her that they were already building in New Jersey. (Dep. at 17); and

7. Goodman told her that the purpose of the Israel trip was to raise money for developing the New Jersey and Florida properties. (Dep. at 33).

Prior to Makavitt's transfer of $20,000 to the joint account of Goodman and DeAzoulay, she alleges that Goodman told her that Goodman, Levin and DeAzoulay were already investing in the Florida properties and that they were going to refurbish and resell them. (Dep. at 37). *Trial of Makavitt's securities and common law fraud claims will be limited to these allegations.*

▮▮▮▮▮ Goodman's common law claims will be tried in this court even though judgment will be entered against her on her federal securities claim. We are mindful that if a federal count is subject to dismissal on a motion for summary judgment, then the district court should ordinarily refrain from exercising jurisdiction over the state law claim in the absence of extraordinary circumstances. *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir.1976). But here Goodman alleged at the outset a colorable federal statutory claim and state law claims which arise out of a "common nucleus of operative fact." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The absence of a substantial federal claim was not apparent on the basis of the pleadings at an early stage in the proceedings. *Tully, supra*

at 196. Indeed, this motion is based on the record developed in a five-day hearing on plaintiffs' motion for a preliminary injunction which was denied. 539 F.Supp. 10 (E.D.Pa.1982). Moreover, here we have "extraordinary circumstances;" Goodman's sister and co-plaintiff is prosecuting federal and pendent state claims against the same defendants arising out of a common nucleus of operative fact. In consideration of the judicial resources extended and the fact that discovery is concluded and the matter is ready for trial, we will exercise our discretion and retain jurisdiction over Goodman's state law claims. *See, Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1969); *Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474 (3d Cir. 1979).[8]

### D. *Makavitt's Common Law Corporate Waste Claims*

▮▮▮▮▮ Makavitt's common law corporate waste claims will be dismissed. Plaintiffs' allege that defendants' waste of GAL's assets diminished the value of their securities in GAL. (Complaint at ¶ 3035). Where the alleged wrong is primarily against the corporation, *i.e.,* the gravamen of the complaint is injury to the corporation or to the whole body of its stock or property, redress must be sought by the corporation in a derivative action. *Davis v. United States Gypsum Co.,* 451 F.2d 659, 662 (3d Cir.1971); *Clinton Hudson & Sons v. Lehigh Valley Cooperative Farms, Inc.,* 73 F.R.D. 420, 427 (E.D.Pa.1977), *aff'd mem.,* 586 F.2d 834 (3d Cir.1978). It is "equally clear that where a corporation tortiously conspires with others to damage an individual and does so, a cause of action arises which belongs to the individual[.]" and "[r]ecovery can be had by the individual against the corporation." *Davis, supra* at 662. Maka-

---

**8.** Recent Third Circuit cases have cast doubt on the colorable federal jurisdiction—expenditure of resources analysis on the pendent state claim issue. *See, Weaver v. Marine Bank,* 683 F.2d 744 (3d Cir.1982). However, a more recent opinion remands to the district court for the exercise of judicial discretion as to whether pendent state claims should be heard where a

constitutional claim could not have been maintained. *See, Shaffer v. Board of School Directors,* 687 F.2d 718 (3d Cir.1982).

We have also considered and determined that *Aldinger v. Howard,* 427 U.S. 1 (1976) does not preclude the exercise of jurisdiction over the pendent state claims.

vitt does not sue Levin and DeAzoulay derivatively on behalf of GAL nor does she sue GAL itself. *See,* First Amended Complaint. Any alleged harm that she suffered was by way of injury to all of GAL's assets which in turn affected the value of all GAL securities. Makavitt may not maintain her action individually. *See, Knapp v. Bankers Securities Corp.,* 230 F.2d 717, 720 (3d Cir. 1956).[9]

## III. CONCLUSION

To summarize, the following claims will be tried:

a. Goodman's common law fraud claims as delineated in this Memorandum;

b. Makavitt's 1933 and 1934 Act claims;

c. Makavitt's common law fraud claims as delineated in this Memorandum.

## ORDER

AND NOW, this 11th day of January, 1983, for the reasons set forth in the accompanying Memorandum, it is ORDERED that Levin's motion for summary judgment is GRANTED in part and DENIED in part:

a. summary judgment is GRANTED on Goodman's federal securities claims and on Goodman and Makavitt's common law corporate waste claims.

b. summary judgment is DENIED on Makavitt's federal securities claims and on Goodman and Makavitt's common law fraud claims.

---

**9.** Plaintiffs' remaining counts seek the equitable remedies of corporate dissolution and the appointment of a custodian. We need not reach these prayers for relief at this stage of the litigation.