**Herbert S. GLICK**

v.

**Joseph F. CAMPAGNA and Washington Marketing & Financial, Inc., Appellants.**

**No. 79–1196.**

United States Court of Appeals, Third Circuit.

Argued Oct. 10, 1979.

Decided Dec. 21, 1979.

As Amended Jan. 3, 1980.

---

**3.** Section 5468 was omitted from the reenacted Criminal Code. Act of March 4, 1909, Pub. L.No. 60–350, ch. 321, 35 Stat. 1088.

Before ADAMS, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this securities case, the plaintiff alleged that he sold his stock in a close corporation for an inadequate price because of misrepresentations by the only other shareholder. Finding violations of rule 10b–5 as well as fraud under state law, the district court ordered defendant to pay damages of a "rescissory nature." The award consisted of one-half the company's revenues, less certain expenses, together with a provision for similar payments in the future. We conclude that a proper remedy would have been rescission coupled with restitution in an amount to be determined in an accounting. Because the record is inadequate for an accounting, we remand for further proceedings on that aspect of the case.

Glick and Campagna each owned fifty percent (50%) of the stock in Washington Marketing & Financial, Inc. (WMFI), a company they formed in January 1974 to arrange and finance computer equipment leases, particularly with the federal government. Campagna was the president and devoted all his time to the corporate business, for which he was to receive a salary of $36,000.00 per year. Glick acted as a board director from the inception of the company until he resigned in September 1975. He spent most of his time, however, in his work as an investment banker. In addition to the $2,000.00 that he invested in the WMFI stock, Glick loaned the corporation $10,-000.00.

In 1974, Campagna, acting on behalf of WMFI, secured an assignment of another

company's equipment on lease to the National Security Agency. As a result of that agreement, if the agency renewed its lease on July 1, 1975 for one year, on July 1, 1976 for 90 days,[1] and on October 1, 1976 for one year, WMFI would receive rentals of $15,-000.00 per month beginning on October 31, 1976. During the period of the lease and its renewals, the agency had the option to buy the equipment, to cancel on 30 days' notice, or to renegotiate the payments downward at the end of each fiscal period.

Because of the rapid technological changes in the computer industry and the fact that agency operations depend on the availability of appropriations, investment in computer leases to the government is highly speculative. The return on such leases, however, is commensurately high and, to meet the risks, Lloyds of London issues policies to some organizations guaranteeing against lease cancellations. But in 1975, it would not insure WMFI. Campagna, in an effort to solve this difficulty, entered into negotiations with the EFM Capitol Corporation, another computer leasing company insured with Lloyds, to get the benefit of its policy and thus improve WMFI's ability to secure financing. Glick was aware of and participated to a limited extent in the preliminary negotiations. He did not know, however, that during June and July of 1975 WMFI and EFM agreed to proceed on a transaction-by-transaction basis and divide the profits equally.

In mid-September 1975, Campagna told Glick that WMFI was out of funds and behind on its withholding taxes, that the joint venture with EFM was not going to be consummated, that business prospects were not bright, and that WMFI was in serious financial difficulty. Glick then resigned as director, apparently concerned about his personal liability for WMFI nonpayment of withholding taxes.

Three months later, at Campagna's suggestion, he and Glick met again. On this occasion, Campagna told Glick that WMFI was in dire straits, and that although the corporation did expect to receive "some funds in the very near future from some small transactions that were about to close," he saw no future in continuing to operate. Campagna said he wanted to place WMFI "in a dormant or limbo position" and go to work for EFM. In fact, he had become a full-time employee of EFM in October because of Lloyds' insistence that only transactions negotiated directly by EFM employees would be insured. Indeed, in November, Campagna had become president of EFM. In addition, Campagna knew, but did not disclose to Glick, that in late 1975 WMFI–EFM contracts to lease equipment to the International Telephone & Telegraph Company, the Veterans Administration, and the Department of Commerce had been or were about to be concluded, resulting in income to WMFI of about $68,-000.00.

When Glick became concerned about the $10,000.00 he had loaned to the corporation, Campagna said that he was sure the money could be repaid provided Glick sold his stock back to WMFI at its original cost, $2,000.00. In subsequent telephone conversations, Glick said that his stock should reflect some value because of the possibility that the National Security Agency lease would be renewed. Campagna responded that "there was a very slight possibility of such a renewal," that he attached no weight to that possibility in valuing the stock, and that in his opinion $2,000.00 was a proper repurchase price. In November, however, in an unsuccessful attempt to obtain a loan from a financial institution, Campagna had represented that the National Security lease equipment was likely to remain with the agency "a very long time."[2]

In January 1976, Glick transferred his stock to WMFI in return for $2,000.00 and repayment of the $10,000.00 loan. Six months later he received a copy of litera-

---

1. The 90-day period was the result of a governmental decision to change the beginning of its fiscal year from July 1 to October 1.

2. Earlier, in the late summer of 1975, Campagna had been rebuffed in an attempt to borrow $45,000.00 for WMFI using the prospective income from the NSA lease as collateral.

ture intended for public distribution which revealed that WMFI was receiving income of $30,000.00 per month from a computer lease and that Campagna had served as president of EFM from November 1975 to May 1976. In September 1976, Glick learned that the National Security lease had been renewed and that it accounted for the income received by WMFI. After failing in his attempts to negotiate an adjustment with Campagna, Glick filed suit.

The complaint alleged, *inter alia,* common law fraud and a violation of rule 10b–5, 17 C.F.R. § 240.10b–5 (1979), and demanded judgment against Campagna and WMFI for (1) rescission of the sale of Glick's stock, and (2) damages in excess of $100,000.00. The answer included an assertion that the plaintiff was dilatory in seeking to rescind.

The district court found that in negotiating for the sale of Glick's stock, Campagna deliberately misrepresented his belief about the possibility of renewal of the National Security Agency lease, the existing financial condition of WMFI, and the corporation's future prospects. The findings also establish that Campagna intentionally failed to disclose to Glick the profitable WMFI–EFM transactions, his employment with EFM, as well as certain loans made by WMFI to EFM and the representative of an associated firm. The trial judge determined that Campagna's conduct was designed to induce Glick to sell his stock back to WMFI at a grossly undervalued price. The court held that Glick, as a reasonable person, relied on these misrepresentations and that he would not have sold the stock for $2,000.00, "or any price even close thereto," had he been informed of the true state of affairs. Defendants accordingly were found liable to plaintiff under both the Securities Exchange Act and the pendent state law claim.

The court entered judgment for the plaintiff in an amount consisting of all monies that Campagna received that were either payments made to WMFI or to which it was entitled, less any expenses. The computations were as follows:

| | |
|---|---|
| Sums received before sale of stock | $ 68,000.00 |
| Receipts from contracts negotiated after sale .................... | 14,000.00 |
| National Security Agency lease & purchase .................... | 268,082.00 |
| Money Campagna received from EFM ........................ | 58,256.66 |
| Additional payment by EFM in 1976 on lease .................... | 25,000.00 |
| Total .................... | $433,288.66 |

The only deductions "as shown by the evidence" allowed by the court were $30,-000.00 in salary to Campagna from WMFI as of December 31, 1975, and commissions paid by WMFI to others totaling $22,000.00. Thus, $52,000.00 was deducted leaving a total of $381,288.66. Glick was awarded one-half ($190,644.33) from which was subtracted the $2,000.00 he had received for his stock. In addition, the court decreed that future revenues should be equally divided between the plaintiff and Campagna.

■ Preliminarily we note that the stock involved here was that of a small, private corporation, neither registered on any national securities exchange nor required to file reports with the SEC. But despite Campagna's argument that he and Glick were in reality partners and the transaction was only the sale of a partnership interest, the trial judge properly found that WMFI had conducted its business as a corporation and the sale, in fact, had been of a security. The court was not incorrect in so ruling.[3] Since the mails were used in connection with the sale of the securities and interstate commerce was involved, there is jurisdiction under the Securities

---

**3.** The author of this opinion is not wholly persuaded that the regulation of small companies, such as WMFI, was intended by the drafters of the Securities Exchange Act. The stock of small, close corporations, such as WMFI here, Duralite in *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir. 1975), and a similar-sized operation in *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir. 1973), is not the subject of the market manipulation that Congress sought to curtail when it enacted the securities laws. Nevertheless, a literal reading of the statute and governing precedent require that we consider this case on the merits. *See* Note, A New Approach To Rule 10b–5: Distinguishing The Close Corporation, 1978 Wash.U.L.Q. 733, 750.

Exchange Act, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5 (1979). *See* R. Jennings & H. Marsh, Securities Regulations 856 (4th ed. 1977).

 The defendant argues that the plaintiff sold his stock despite the fact that he knew the National Security Agency lease might be renewed and, even after discovery of that event, delayed seeking rescission. The district judge, however, took into account the fact that the defendant had greater access to information than plaintiff who was inactive in the management of the company, that there was active misrepresentation in this face-to-face transaction, and that Glick had no reason to question the honesty of his colleague. The factual situation is similar to that in *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir. 1975), where we affirmed a finding of liability. The resolution of these issues depends on determinations of credibility, an area where the factfinder possesses better facilities than an appellate bench. On the question of laches, the court found that it was not until September of 1976 that Glick learned that the National Security Agency lease had been renewed and that he filed suit within a month after the discovery. The district court's determination that the suit was timely under these circumstances does not constitute error. *See Churma v. United States Steel Corp.,* 514 F.2d 589, 592–93 (3d Cir. 1975); *Johns Hopkins University v. Hutton,* 488 F.2d 912, 915–17 (4th Cir.), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). The findings of fact in the liability phase of the case were not clearly erroneous and we find no error in the conclusions of law determining the defendants' culpability. We therefore will affirm the liability portion of the district court's judgment.

The question of remedy, however, is one that the district court found "troublesome." In his complaint, the plaintiff asked for rescission and damages. The court did not decree a true rescission but rather utilized a "rescissory measure of damages"—a hybrid form of relief. Although the court did not specifically order the return of the stock, it did require Glick to give credit for the $2,000.00 he had received from the defendants.

In explaining the award, the trial judge said "rescission as the sole relief . . . would not place the plaintiff in the same position he would have been absent the fraudulent sale." He held that the plaintiff was "entitled, in addition, to damages for the interim period." The court recognized that the "technically correct way" to grant relief would be to decree rescission of the sale and provide for an accounting but decided against this procedure, stating that it would "lead only to further litigation." Instead the court awarded a sum of money consisting of half the revenues WMFI had received, less certain expenses, and provided for a similar allocation of future revenues. The court acknowledged that the evidence at hand was "rather scanty" but observed that proof of damages in cases of this type often is difficult.

 A defrauded seller may sue for damages or for rescission in a 10b–5 case. The traditional measure of damages is the difference between the fair value of what the seller receives for his stock and what he would have received had there been no fraudulent conduct. If the defendant resells the stock at a profit, the plaintiff is entitled to the gain to the extent it was not due to special efforts on the part of the defendant. *Thomas v. Duralite, Co., supra* at 586; *Rochez Brothers, Inc. v. Rhoades,* 491 F.2d 402, 411–12 (3d Cir. 1973).

 The plaintiff may choose, however, to seek the equitable remedy of rescission rather than common law damages. If the defendant still owns the stock, the plaintiff may have the shares returned to him and, in addition, secure an accounting of the money he would have received during the period in which the defendant owned the stock. *See* III L. Loss, Securities Regulation 1792–96 (1961).[4]

4. For a general discussion, see Jacobs, The Measure of Damages in Rule 10b–5 Cases, 65 Geo. L. J. 1093 (1977).

■ In the case at bar, plaintiff asked for rescission and, presumably for this reason, did not prove the value of the stock, a necessary predicate for the traditional method of awarding damages. Because of the difficulty in establishing the value of stock in a close corporation, the courts have given plaintiffs broad latitude in proving this element. Thus value at times other than the date of sale may suffice. VI L. Loss, Securities Regulation 3922–23 (1969). Earnings records, see *Broffe v. Horton,* 172 F.2d 489, 494–95 (2d Cir. 1949), and corporate performance after the sale may provide guidance. *Dupuy v. Dupuy,* 551 F.2d 1005, 1024–25 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). The business ability of the principal stockholders and those in management positions may be helpful. *Gottlieb v. Sandia America Corp.,* 304 F.Supp. 980, 992 (E.D. Pa. 1969), *aff'd in relevant part,* 452 F.2d 510 (3d Cir.), *cert. denied,* 404 U.S. 938, 92 S.Ct. 274, 30 L.Ed.2d 250 (1971). That kind of evaluation, however, was not attempted in this case. The court simply stated that "from the standpoint of the difference between the price paid for the stock and its then value, it would appear reasonable to conclude it was worth at least as much as the damages to be awarded," referring to the gross earnings less expenses that it had computed. That statement was merely conclusory and does not provide an adequate foundation for determining the stock's value. The court did not elaborate on its statement and we have no way of ascertaining how it arrived at its conclusion.

■ In any event, it appears that the court intended to make an award that it termed "rescissory in nature" rather than to determine traditional damages. If a plaintiff asks for rescission and that relief can be given without impairing the rights of third parties, the court may frame a decree returning the parties to the status

they occupied before the challenged transaction. Thus the court could declare the sale void and require the defendant to return the stock. To give complete relief, the court could order restitution so that the plaintiff would be in the same position he would have been had no sale occurred.

■ If the defendant no longer owns the stock or it is otherwise unavailable because of a merger or other intervening event, then the court may award rescissory damages to place the plaintiff in the same financial position he would have been were it possible to return the stock. *See, e. g., Speed v. Transamerica Corp.,* 135 F.Supp. 176, 186–94 (D.Del.1955), *modified on another point and aff'd,* 235 F.2d 369 (3d Cir. 1956). We need not address that question in the case at bar, however, since there is nothing to prevent the return of the stock. Rescission should have been granted, requiring that defendants return the stock to the plaintiff, and restitution ordered. In this case that would require an accounting from the defendants.[5]

■ The district court in an understandable effort to expedite the case, apparently used the evidence introduced to show Campagna's misrepresentations as the basis for the award. As the court admitted, however, "[u]ndoubtedly there may be other income that was received by WMFI or by Campagna that rightfully belonged to WMFI. There may also be other proper deductions that WMFI could claim. It is also obvious that had Glick retained his stock, he would not necessarily have been entitled to receive in cash, one-half of the net revenues of WMFI." The purpose of rescission and restitution is to restore the plaintiff to where he would have been had the sale not taken place. To place him in a better position is beyond the scope of the remedy and amounts to punishment of the defendant.

**5.** Although Glick's complaint did not specifically request an accounting, the district court has authority under Fed.R.Civ.P. 54(c) to conduct one. That rule provides, in part, that "[e]xcept as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." *See generally* 10 C. Wright & A. Miller, Federal Practice and Procedure § 2664 (1973).

The court found the defendant liable on the basis of rule 10b–5 and common law fraud. Being entitled to relief under either state or federal law, plaintiff will no doubt elect the more generous of the two if, in fact, there is a difference. We do not elaborate on the state measure of damages at this point since it was neither briefed nor argued.[6]

An accounting in the case at bar will give the parties an adequate opportunity to develop their positions. Since that procedure will provide the opportunity for adequate factual development on such matters as the money received from EFM by Campagna and other possible additions or deductions, we need not pass on the defendants' objections to those items.

Accordingly, the judgment of the district court will be affirmed insofar as it establishes liability on the part of the defendants. The damage award will be vacated and that phase of the case will be remanded for further proceedings consistent with this opinion. Costs taxed against the appellants.

---

**6.** In *Brooks v. Conston*, 364 Pa. 256, 72 A.2d 75 (1950), the Supreme Court of Pennsylvania approved a remedy similar to that used in 10b–5 cases. In *Brooks,* the fraudulent purchaser of a chain of retail stores was required to account for profits earned but with allowances for the defendant's services that increased the value of the property. As the court remarked, "[a]ctions of restitution are not punitive." *Id.* at 263, 72 A.2d at 79.