Regis J. KIRBY, Marie Maiers, Emily Traum, Henry Simmons, Patrick Maloney and Norbert Loveland, and all others similarly situated, Appellants,

v.

UNITED STATES GOVERNMENT, DEPARTMENT OF HOUSING & URBAN DEVELOPMENT, St. Francis General Hospital and St. Francis Plaza, Inc.

No. 83–5439.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
June 15, 1984.

Decided Sept. 20, 1984.

Richard H. Martin, Joan P. Feldman, Baskin & Steingut, Pittsburgh, Pa., for St. Francis General Hosp. & St. Francis Plaza.

Michael W. Zurat, Zurat & Schmalzried, Pittsburgh, Pa., for appellants.

J. Alan Johnson, U.S. Atty., Paul J. Brysh, Asst. U.S. Atty., Pittsburgh, Pa., Peter M. Campanella, Regional Counsel, Ann E. Harrison, Dept. of Housing and Urban Development, Philadelphia, Pa., for United States Government and Department of Housing and Urban Development.

Before SEITZ, Circuit Judge, and STEWART, Associate Justice,* and ADAMS, Circuit Judge.

* Honorable Potter Stewart, Associate Justice (retired) of the United States Supreme Court, sitting by designation.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Residents of a Pittsburgh neighborhood in which a housing project for the elderly and handicapped was constructed brought suit in the district court. The complaint alleged various statutory and regulatory violations by the United States Department of Housing and Urban Development (HUD), which subsidized the project, by St. Francis General Hospital, which sponsored the project, and by St. Francis Plaza, Inc., which supervised the project through its governing board. The district court granted the defendants' motion for summary judgment, dismissing the action as moot on the ground that no appropriate relief could be fashioned. We vacate and remand.[1]

### I.

This case comes before us for the second time. Inasmuch as the factual background is set forth fully in *Kirby v. United States*, 675 F.2d 60 (3d Cir.1982) (*Kirby I*), we recount the circumstances only briefly. In 1978 St. Francis General Hospital of Pittsburgh filed an application with HUD, seeking to sponsor a housing project for the elderly and handicapped. The project, organized as St. Francis Plaza, Inc., was to be financed under § 202 of the Housing Act of 1959, 12 U.S.C. § 1701q (1982). The project site was located adjacent to the Hospital, on land previously owned by the Hospital. Three floors of the fourteen-story structure were to be devoted to commercial use, but this commercial space was allocated for use by the Hospital itself. One floor was to be employed as physicians' offices, and two floors to maintenance of a computer center—facilities previously located within the Hospital. Additionally, the Hospital and the Plaza project were to have identical boards of directors. Despite the "concerns involving institutional character" that this interlocking arrangement raised, HUD approved the project. *Kirby I*, 675 F.2d at 62 (quoting

Memorandum, March 21, 1980, of Paul T. Cain, Pittsburgh Area Office, HUD, to Director of Multifamily Housing Development, HUD).

Residents of the neighborhood in which the Plaza project and the Hospital are located filed a complaint in 1980, alleging numerous regulatory and statutory violations by both HUD and the Hospital. The district court dismissed the action on the grounds that the residents lacked standing and had failed to state a claim upon which relief could be granted. On appeal this Court reversed, finding standing and holding that the plaintiffs had asserted at least two colorable claims. *Kirby I*, 675 F.2d at 68. The first involved a violation of applicable HUD regulations providing that "hospitals ... are not eligible for loan assistance" under the Housing Act. *See* 24 C.F.R. § 277.4(c) (1983). Since the plaintiffs alleged that the Plaza was constructed in order to free up space in the Hospital and asserted that three floors in the new building were in fact set aside for Hospital use, the complaint adequately stated a claim that § 202 funds were improperly used. The second claim concerned the inadequacy of community representation on the governing board of the Plaza project, allegedly in violation of 12 U.S.C. § 1701q(d)(2)(B) (1982), which mandates that any HUD-funded project have a governing board selected in a manner "to assure that there is significant representation of the views of the community in which such project is located."

Construction continued during the initial stages of the litigation, and the building was formally completed in November, 1982. On remand, after *Kirby I*, the district court took cognizance of this altered circumstance and granted the defendants' motion for summary judgment on the basis that the completion of construction and the final payment by HUD of the project's costs rendered the case moot. *Kirby v. United States Dept. of HUD*, 563 F.Supp. 248

---

**1.** Appellees request that we address only the district court's mootness ruling in view of the fact that this case has already been before us

once, in the interest of judicial economy we exercise our discretion and decline to follow that suggestion.

(W.D.Pa.1983). In the alternative, the district court asserted that with regard to the alleged violation of HUD regulations prohibiting loan assistance to hospitals, any possible "post-construction relief would be too severe." *Id.* at 250. Moreover, the district court found that the law requiring local community representation on the project's board had not become effective until after the Plaza project had been approved by HUD, and held that the law should not be applied retroactively. *Id.* at 251. Finally, assuming that the local representation requirement did apply, the district court held that inasmuch as the members of the Plaza board were residents of the general Pittsburgh area, the statute had not been violated. *Id.*

## II.

■ In applying the mootness doctrine, the Supreme Court has stated that for a case to be justiciable,

[t]he controversy must be definite and concrete touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937) (citations omitted). The concept of mootness encompasses both constitutional principles under Article III, and jurisprudential policy considerations. With regard to the latter, it is entirely proper for a court to focus on its present ability to provide any meaningful remedy in light of changed circumstances relating to the case. For example, termination of a challenged act often may moot a case. *See, e.g., City of Romulus v. County of Wayne,* 634 F.2d 347 (6th Cir.1980) (attempt to enjoin construction of airport runway is moot when runway was finished): *Friends of the Earth, Inc. v. Bergland,* 576 F.2d 1377, 1378–79 (9th Cir.1978) (mining operation ceased, so challenge to approval of the

drilling based on alleged violation of environmental statutes was moot).

Although emphasis on the efficacy of the remedy is appropriate, changed circumstances will frequently moot only some forms of relief, leaving other useful forms available. *See* 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533 (Cum.Supp.1980): *see also Blackshear Residents Organization v. City of Austin,* 659 F.2d 36, 38 (5th Cir.1981) (residents sued HUD and city, alleging improper use of federal community block grants: expenditure of funds and completion of projects made injunctive relief meaningless but did not moot case since other forms of specific relief were requested): *Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 591 n. 1 (9th Cir.1981) (completion of challenged construction of power-line towers did not moot case since various forms of relief remained available, including possibility of ordering towers removed).

■ Closely related to the mootness issue here is Federal Rule of Civil Procedure 54(c), which provides in part that in a non-default case a "final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." The rule requires that a court ascertain whether the plaintiffs are entitled to *any* remedy, not whether they have asked for the proper remedy. As long as the plaintiffs have stated a claim for relief, it is the court's obligation to grant the relief to which the prevailing party is entitled whether it has been specifically demanded or not. *Cf. Glick v. Campagna,* 613 F.2d 31, 37 n. 5 (3d Cir.1979); *see also* 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2664 (1983).

■ In the present case the district court's finding of mootness and its related holding of the impracticability of alternative forms of equitable relief appear to be grounded on a mistaken interpretation of the residents' claims. The court assumed that the plaintiffs were unalterably opposed to the construction of the entire Pla-

za project; indeed the plaintiffs originally did seek to enjoin construction. This view led to the conclusion that because construction had been completed, "the relief sought has become impossible." 563 F.Supp. at 250. Similarly, the court declined "to adopt the drastic remedy of demolishing a useful structure," a step the court believed to be the only alternative means of affording the plaintiffs the relief they sought. *Id.* While the initial complaint in this case is less than clear in its demand for relief, the residents did explain to the district court that they were not seeking destruction of the building, but desired only to effectuate the removal from the Plaza of the computer center and physicians' offices. During a status conference after the remand to the district court, plaintiffs' counsel engaged in the following colloquy with the court:

> THE COURT: ... [I]f the building's already built, I suppose it would be uneconomical, even though there's a depression in the construction industry, to just blow up the new building for the sake of building something else in its stead. I guess there would also be no chance of collecting from the government the amount of money they've already spent improperly, as you allege. So, I don't think that would be a helpful remedy.
>
> COUNSEL: We never really attempted that remedy, Your Honor, even from the first day the lawsuit was started. It was our understanding that if redesign occurred, it would simply be the matter of changing a doctor's office to a room or an efficiency for an elderly. It is our position that we never ever wanted to stop the building of housing for the elderly. What we wanted to stop was the misappropriation of moneys for other uses not related to the elderly. And certainly, if a building has, say, six million square feet of open space, or has large computers in it, it would be a matter of simply moving in portable partitions and making a different use of the building.

App. at 32–33. Elsewhere in the same discussion counsel stressed:

> [W]e would much rather that they put more units for the aged in there. I think that's basically the purpose behind our lawsuit. But I think Your Honor's correct in saying that if the computer center was not here, it certainly would eliminate much of our objections.

App. at 4–5.

In addition, the district court should have been guided by our decision in *Kirby I*, in which we held that a basis for plaintiffs' standing was the allegation that nonconforming commercial uses of the building increased the flow of nonresidents into the neighborhood, thereby resulting in economic and aesthetic injury. We noted that:

> A properly conforming commercial use could well result in less commercialization of the neighborhood and thus better support residential property values than would the allegedly nonconforming use.... Locating the doctors' offices and the Hospital's computer system in the Plaza will significantly increase the flow of people and commercial activity in the building and thus disturb the neighbors living contiguous to it.

*Kirby I,* 675 F.2d at 65. The theory of standing in *Kirby I* necessarily presupposed the remedy the plaintiffs sought on the original remand and now seek, namely, alteration of the improper use of the three commercial floors.

Because of the potential availability of this form of relief, we cannot agree with the district court's dismissal of this action on the ground of mootness. The district court should address the merits of the contention that the use of § 202 funds to construct commercial space improperly employed by the Hospital, concurrently freeing existing Hospital space for other uses, is a violation of the prohibition on loan assistance to hospitals. *See* 24 C.F.R. § 277.4(c) (1983). At the same time the district court should consider the issue whether the computer and office facilities in the Plaza are "related facilities" within the meaning of 12 U.S.C. § 1701q. The Housing Act was designed to assist sponsors in providing both housing and "related

facilities" for elderly and handicapped families. 12 U.S.C. § 1701q(a)(1) (1982). Related facilities are defined as

> new structures suitable for use by elderly or handicapped families residing in the project or in the area as cafeterias or dining halls, community rooms or buildings, workships, adult day health facilities, or other outpatient health facilities, or other essential service facilities.

12 U.S.C. § 1701q(d)(8)(A) (1982). The regulations implementing the statute elaborate upon the definition of related facilities, noting that commercial facilities "may be included if they are essential for the elderly or handicapped families in the project and are not otherwise conveniently available to them." 24 C.F.R. § 277.4(e) (1983). The Hospital should be afforded the opportunity to demonstrate that the computer center and physicians' offices are both essential and not otherwise conveniently available to the project's residents.

### III

Plaintiffs also assert that the composition of the Plaza board violates the statutory command that a project's governing board have a "membership which is selected in a manner to assure that there is significant representation of the views of the community in which such project is located." 12 U.S.C. § 1701q(d)(2)(B) (1982). The district court assumed, however, that this provision did not become law until after HUD had approved the Plaza project in 1978. The court refused to apply the law retroactively, concluding that the "retroactive invalidation of the St. Francis Plaza project" would result in the "[d]isruption, frustration, and nullification of a whole year's work by HUD" through repercussions on the rank-order of other projects considered by HUD that year. 563 F.Supp. at 251.

■ We conclude that even assuming the community representation provision

had not yet become effective, it should be applied retroactively under the facts of this case. Regarding retroactivity, the Supreme Court in *Thorpe v. Housing Authority,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) and *Bradley v. School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), has stated that in cases pending at the time a law is changed, or filed thereafter, courts are bound to apply the new law unless (1) there is a clear legislative directive to the contrary or (2) to do so would cause manifest injustice to the party adversely affected by the change. *See New Jersey Department of Education v. Hufstedler,* 724 F.2d 34, 36 (3d Cir.1983). Neither the text of the statute nor its legislative history suggest any directive prohibiting its retroactive application, and thus the first exception is not apposite here.

Appellees contend, however, that application of the law will somehow create substantial effects on other HUD-funded projects by upsetting the rank-order of the various projects that had been in the competition for limited loan funds.[2] This argument misconstrues the purpose of the statute. The section mandating significant representation of the views of the community is not merely a technical pre-requisite for loan assistance, but rather, it establishes an ongoing duty, which continues even after HUD funds have been totally disbursed. The act defines a governing board as the entity "which is responsible for the operation of the housing project assisted." 12 U.S.C. § 1701q(d)(2)(B) (1982), and the legislative history demonstrates a concern by Congress that residents of the community be involved in both "the development and operation" of the housing project. H.R.Rep. No. 1792, 95th Cong., 2d Sess. 71, *reprinted in* 1978 U.S.Code Cong. & Ad. News 4773, 4891 (1978). Congress clearly did not intend for any violation of the continuing duty to maintain community representation on the governing board—no matter when such violation occurred—to result

---

**2.** The regulations implementing the loan statute demonstrate that the funding process for § 202 projects is a competitive one that ranks each application for funds against all other applications submitted in a particular fiscal year. HUD contends that a retroactive application of the statute might change the relative position of each project in the ranking.

in an invalidation of an entire project and concurrent ripple effects on other HUD projects. Instead, such violation would call for a change in board membership to ensure that the views of the community be represented in a significant way on the policy making board responsible for the operation of the project.

We also disagree with the district court's interpretation of "community" as used in the act. The fact that all members of the Hospital's board, and thus the Plaza's board, are residents of the greater Pittsburgh area does not automatically end the necessary inquiry. While the term "community" may be susceptible to various interpretations, the legislative history of the act indicates a fairly narrow definition—a board that is representative of the area immediately surrounding the project. The Conference Report, for example, explains that the provision was "intended to increase the involvement of *local* residents." H.R.Rep. 1792, 95th Cong., 2d Sess. 71, *reprinted in* 1978 U.S.Code Cong. & Ad.News 4891 (1978) (emphasis added). The House Report is even more instructive, particularly because the House version of the relevant section was finally adopted. The House Report expresses an intent "that the views of the community in which a section 202 project is located be represented in a significant way" and requires that the governing board have a membership "which assures that there is significant representation of the views of the *particular community* in which the project is located and not solely the views of an organization or sponsor whose scope of interest extends beyond this particular community." H.R.Rep. No. 1161, 95th Cong., 2d Sess. 21 (1978) (emphasis added).

The Conference Report does make reference to the permissible participation of national nonprofit organizations in the loan program. This does not, however, as has been urged on us, aid in the definition of the term "community" by creating an instructive distinction between "local" and "national." We believe that the section of the Conference Report making clear that the increase in local involvement mandated by the act does not preclude the participation of national organizations in the loan program is merely a caution that local residents need not control the governing boards of HUD-funded projects—a reading that would limit involvement by national organizations. Congress intended merely that local interests be represented "in a significant way." H.R.Rep. No. 1792, 95th Cong., 2d Sess. 71, *reprinted in* 1978 U.S. Code Cong. & Ad.News 4891 (1978).

On remand the district court should determine whether the project's board has a membership which ensures meaningful representation of the views of the local community in which the Plaza project is located, or, as alleged, solely the views of an organization whose interests extend beyond the particular community involved.

### IV

The judgment of the district court will be vacated and the case remanded for further proceedings consistent with the opinion.