## In re NATIONAL STUDENT MARKETING LITIGATION.

### MDL No. 105.

United States District Court,
District of Columbia.

Nov. 9, 1984.

See also, D.C., 517 F.Supp. 1345.

Charles Duncan, Nathalie P. Gilfoyle, Robert C. Hacker, Jay D. Pedelty, Pea-body, Lambert & Meyers, Washington, D.C., for Special Master.

Richard J. Braemer, Steven T. Stern, Braemer & Kessler, Philadelphia, Pa., for claimant Herbert M. Frank and Raymond Gold (Renselaar).

William M. Bradner, Jr., David R. Baker, Chadbourne, Parke, Whiteside & Wolff, New York City, for claimant George W. Schiele (Mailbag/M.I.I.).

## MEMORANDUM OPINION

### (Renselaar Corporation and Mailbag/M.I.I.)

BARRINGTON D. PARKER, District Judge:

### INTRODUCTION

On August 22 and 23, 1984, hearings were held to determine what valuations should be placed on Renselaar Corp. ("Renselaar") and Mailbag International, Inc. ("Mailbag") and its affiliate M.I.I. Services, Inc. ("M.I.I.") collectively referred to as Mailbag/M.I.I. At the hearings, the Court received and considered testimony, exhibits and other evidence submitted and proffered by Duff & Phelps, Inc. ("Duff & Phelps"), the expert witness engaged by the Special Master. Also reviewed and considered were the testimony, exhibits and evidence proffered by the claimants Renselaar and Mailbag/M.I.I., represented by their former owners Raymond Gold and George Schiele and their expert witnesses Gabriel Nagy and Thomas Dewey.

At this time, the Court is called upon to make a *de novo* determination of the reasonable fair market value for the two companies acquired by National Student Marketing ("NSM"). The fair market value of a company under the circumstances presented is the price a willing buyer would pay a willing seller in an arm's-length transaction in which both parties are reasonably informed and knowledgeable about all relevant facts, and are not acting under compulsion.

## A.

In the spring and summer of 1969, the former owners of Renselaar and Mailbag/M.I.I. exchanged their stock in those corporations for NSM shares. At the time, Renselaar and Mailbag/M.I.I. shares were not publicly traded and there was no active market for the stock. The only known "sales" of their stock occurred in connection with the 1969 NSM mergers. Under the circumstances it was thus appropriate to consider a variety of factors in determining the fair market values of the companies at the time of merger. Among the relevant factors considered were: the nature of the companies' products; the life and history of the companies; their size and growth potential; and, the financial operations of the companies.

After a review of the testimony, exhibits, documents and all evidence presented at the valuation hearings; after weighing the credibility, experience and expertise of the several witnesses appearing both for the Special Master and the claimants; and, after considering the post-hearing memoranda of the parties, the Court determines that: the fair market value of Renselaar as of the date of acquisition—April 10, 1969, was $4.1 million; the fair market value of Mailbag/M.I.I. as of the date of acquisition—October 14, 1969, was $2,987,057.

Pursuant to Rule 52, Fed.R.Civ.P. the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In March 1983, Charles Duncan, Esquire, and the law firm of Peabody, Lambert & Meyers were appointed as Special Master in this proceeding. Their responsibility, *inter alia*, was to process and to determine the validity of proofs of claims submitted by claimants who had previously exchanged stock in corporations owned by them for NSM shares.

With Court approval the Special Master engaged Duff & Phelps, a Chicago-based firm, to undertake an independent financial analysis and to assist in establishing the validity of the submitted claims and deter-mining the reasonable fair market values for the several companies acquired by NSM in a stock for stock transfer. For more than 20 years Duff & Phelps has been involved in investment research, provided financial analyses to corporations and institutions, and also provided professional consulting and special valuation studies for companies involved in mergers and acquisitions. They are not brokers/dealers or investment bankers. Duff & Phelps was no stranger to this litigation. Earlier in the proceeding it served as an independent financial analyst to counsel for NSM and counsel for the class plaintiffs.

## A.

The Special Master and Duff & Phelps gathered all available information relevant to the value of the companies at the time of acquisition. Based on that data, Duff & Phelps then determined what they considered to be a range of reasonable and fair values for each company.

With few exceptions a range of values was based on a discounted cash flow analysis, using projections of operations of a particular company as if it had not been acquired by NSM. In determining the reasonableness of its results, Duff & Phelps compared the price/earnings ratio resulting from the discounted cash flow analysis with price/earnings ratio relating to other acquisitions by NSM during this period as well as relevant financial data from other comparable companies.

Over and beyond this approach and the valuations determined by Duff & Phelps, the Special Master made an independent determination of what it considered to be the fair market value of NSM shares received by former owners of an acquired company. However, values ascribed to those shares by the claimants, and in some cases the number of shares, were higher than what the Special Master determined was appropriate.

An important aspect of the valuation process utilized in connection with NSM shares transferred outright was that of discount-

ing by one-third the quoted market price on the date of the acquisition to reflect the fact that the acquired NSM shares were "lettered" or "restricted," not registered with the Securities and Exchange Commission, and thus could not be sold readily on the open market. This was an acceptable and recognized procedure in the valuation process. Indeed it was first utilized and sanctioned in connection with an evaluation and study of the private placements of restricted NSM stock during the period September 1, 1967 to December 31, 1970. Touche Ross, an accounting firm, reviewed NSM accounting through that period, including all private placements of restricted stock, and concluded that, on the average, such stock sold for two-thirds of the market price of unrestricted stock. Accordingly, on that basis, the Special Master consistently and appropriately applied a one-third discount in valuing restricted NSM stock.

The Court has no problem with such an approach. The practice and reasoning is sound. It recognized the realities of the securities market. It is a well-established and generally recognized principle employed in determining stock values. It was appropriately applied as to both Renselaar and Mailbag/M.I.I.

The merger agreements generally provided for the transfer of a specified number of NSM shares at the closing. Many of the agreements provided for "loss" escrow stock accounts. The provision for such accounts was intended to protect NSM against undisclosed liabilities of an acquired business. In some instances "earn-out" provisions provided for additional NSM shares to the former owner if the acquired business reached certain levels of financial success. A few of the agreements established "market-protection" escrow accounts providing for release of NSM shares if their market value fell below specified levels.

A discussion of the problems associated with the determination of the fair market value of Renselaar and Mailbag/M.I.I. follows.

## RENSELAAR CORPORATION

Renselaar was acquired by an agreement with NSM dated April 10, 1969. At that time its sole shareholders were Raymond Gold and Herbert Frank.

The company was concerned principally with the production and distribution of wall decors and a wide variety of poster products. Its products were targeted to consumers under the age of 25.

The wall decor poster industry was highly fragmented and a large number of companies competed for the market. Renselaar was engaged in a high risk and trendy business. While it was recognized as the industry leader, it only had an eight percent share of the entire market. In some instances it had exclusive licensing agreements but at the same time, design copying by many competitors was a continuing problem.

Posters generally had a short period of popularity and were subject to rapidly changing youth fads. While it was necessary for a company to continually update its lines so as to capitalize on current trends and fads, the nature of the market made it almost impossible for a company to be certain that its products would be continually accepted.

### A.

Renselaar was formed in 1965 and operated at a loss through October 1965. Fiscal year ending October 1966 was its first full year of operation. The corporation was operated at a profitable level until its acquisition by NSM.

Under the merger agreement, the Renselaar owners received 145,396 shares of NSM lettered or restricted stock. A total of 72,968 were issued on April 10, 1969. An additional 72,968 shares were issued pursuant to the earn-out provisions of the agreement.

Claire Hansen of Duff & Phelps testified that a reasonable value for Renselaar in April 1969 ranged from $3.1 to $4.1 million. He relied upon a discounted cash flow anal-

ysis in arriving at that valuation. Renselaar's counsel agreed that such an analysis was appropriate and a generally accepted method of approach.

In making its analysis Duff & Phelps reviewed Renselaar's past sales and earnings performance. Based on that review, projections were made of the company's revenues and cash flow. Future cash flow was then discounted to present value using an appropriate discount rate which Duff & Phelps determined was from 22 to 24 percent. In Hansen's opinion, an interested buyer would have expected such a return on an investment in the company. The discount rates led to the valuation ranges of $3.1 to $4.1 million.

The underlying assumptions upon which Duff & Phelps relied in making its projections for the greater part were taken from a document, *Poster Prints—Progress Report and Annual Plans* (Special Master Ex. 6), written and prepared by Renselaar management for the benefit of NSM in June 1969. The document projected increased revenues and pre-tax earnings for 1970 through 1972. Duff & Phelps assumed the same levels of increase projected in the claimants' document. The Court finds that document credible evidence of the prospects for growth assumed by Gold and Frank within two months after the merger was consummated. Under the circumstances it was thus reasonable and proper for Duff & Phelps to make use of such recent projections.

Using management's revenue projections for 1970–72, and the actual revenue for 1968, Duff & Phelps calculated revenues through fiscal 1969 (October 31). Based on the data generated by the claimants, sales were projected to increase 30 percent annually from 1969 to 1972. The actual percentage increase was less than 30 percent but was rounded off to that amount by Duff & Phelps.

On October 15, 1984, the claimants were granted leave to present additional and recently discovered evidence after the close of the hearings in support of Mr. Gold's testimony that a 60 percent growth in revenues for 1969 was more reasonable than the Duff & Phelps projections. That additional evidence related to December 1968, however, and the actual results for the first part of 1969 may have suggested the need for lower revenue projections. Mr. Gold's explanations of June 1969 projections are not reliable and persuasive over and against the Duff & Phelps' response and analysis. The claimants' most recent submissions of November 8, 1984, have also been considered in arriving at this determination.

In justifying the discount rates, Duff & Phelps relied on several relevant factors including: the trendy nature of the business, the fact that the business was a high risk undertaking, the yields then available from other investments in the securities market; and, a comparison of Renselaar with other companies acquired by NSM.

The Special Master, relying upon an alternative method, arrived at a comparable valuation of $4.0 million based on what it considered to be the fair market value of the NSM shares received by Renselaar's former owners. Because the NSM stock was lettered, a one-third discount was applied to reflect the stock's lower value. No challenge was voiced either to such an approach or as to the rate applied.

The initial 72,698 shares of restricted NSM stock were issued on April 10, 1969 and on that date the mean average of the bid and ask market price was $41.50. That stock, however, was worth less than the unrestricted stock. The value calculated for the 72,698 shares was $2,011,311 [72,698 × $41.50 × ⅔ = $2,011,311]. The Special Master assumed that the earn-out shares would in fact be issued and the value of those shares on April 10, 1969 was an additional $2.0 million. The value of a sizeable portion of those earn-out shares, when issued, was significantly less, and if their value was actually calculated on the date of issuance, the total value of the shares received would have been considerably less than their value on April 10, 1969.

In view of all the evidence presented, the Special Master recommended that a valua-

tion of $4.1 million for Renselaar was fair and reasonable. The Court finds that the testimony and analyses and the valuation range of $3.1 to $4.1 million presented by the Duff & Phelps expert witnesses were adequately supported by substantial evidence in the record and was more persuasive than the testimony proffered by claimant Gold and his expert witness. While the Special Master arrived at a slightly less valuation, the difference is minimal and the Court finds that the $4.1 million valuation is justified.

## MAILBAG INTERNATIONAL, INC. AND M.I.I. SERVICES, INC.

Mailbag International, Inc. was formed in 1955. In 1969 it was owned by George Schiele and William Torgis, who were the sole owners at the time of the National Student Marketing acquisition.

M.I.I. Services, Inc. was formed in 1967 and was wholly owned by Schiele. It was affiliated informally with Mailbag at a later date.

When acquired by NSM, the two companies were recognized as a single business enterprise, however, M.I.I. maintained a separate corporate identity. The companies were engaged essentially in the same business, namely, direct mail advertising of samples and other promotional materials on behalf of subscribers. Participating advertisers paid to be included in various annual editions of Mailbag/M.I.I. direct mailings. The target market of the mailings was focused almost exclusively on high school, college and young adult groups.

### A.

Under the merger agreement, the owners of the two companies received a total of 90,434 shares of restricted NSM stock. Of that total, 9,044 shares were placed in a "loss" escrow account and then subsequently released to the former owners. Immediately following the merger, Schiele registered and sold 13,500 shares for a total of $627,750.

Employing a discounted cash flow analysis, the same procedure as relied upon in similar transactions, Duff & Phelps concluded that a reasonable value for the acquisition ranged from $1.2 to $1.6 million.

The Special Master arrived at an independent and higher valuation. At the same time, however, the valuations proposed by Duff & Phelps were considered. Initially, a tentative valuation of $1.9 million was determined which was conveyed to Schiele. Thereafter, as in all instances, a conference was held with Schiele and his representatives. On this occasion, May or June, 1984, Schiele represented for the first time that the net income figures reported on Mailbag's federal corporate income tax returns for 1978, 1977 and 1976 and which had been previously relied upon, were understated and should be adjusted. The adjustment was required because the Internal Revenue Service rejected certain claimed deductions and expenses relating to wages and other compensation reported on Mailbag's tax returns for those years. This was unknown to Duff & Phelps since they had submitted their analyses and valuations at an earlier date. Indeed, this was the first time that Schiele disclosed such information to anyone in the course of this proceeding.

The Special Master then reconsidered his earlier findings and concluded that a reasonable valuation of the companies should be based on the total number of NSM shares received by the claimants, namely, $2.83 million. In arriving at that figure, he considered the 13,500 shares sold for $627,750, plus the value of the remaining restricted shares (discounted by one third to reflect the restriction). The stock sale price relied upon was as of August 8, 1969, the date that the merger agreement was signed. The mean average between the bid and ask prices of unrestricted NSM stock on that date was $43. The Special Master relied upon the following computation to arrive at the $2.83 million valuation: $[(90{,}434 - 13{,}500) \times \$43 \times \frac{2}{3} + \$627{,}750 = \$2{,}833{,}191]$.

### B.

Schiele's expert, Thomas Dewey, headed his own New York-based firm. He had considerable prior experience in providing advice, opinions, and services on such matters as corporate valuations, mergers and reorganizations. He was retained by Mailbag/M.I.I. in May 1984.

In Dewey's opinion the value of the two companies was $4,159,964 arrived at by multiplying the 90,434 NSM shares received by his clients by the mean average of the bid and ask price of $46 per share on October 14, 1969. The Court questions his analysis. It was limited, unduly restricted and contrary to the preponderance of credible testimony and evidence. As an expert, Dewey dismissed and rejected summarily the discounted cash flow analysis without offering any justification or reasons. Likewise, he summarily dismissed and rejected the view that the value of the shares received by Schiele were affected in any way by the fact that a substantial number was lettered or restricted. Schiele's counsel argued, and his client testified that since he intended to hold the shares for investment, it should make no difference what restrictions were imposed.

But this Court finds that Schiele's intentions did not in any way alter or change the principle involved. The value of those shares should be discounted in terms of their real value as to what an informed, reasonable and prudent person would be willing to accept under the circumstances and at the particular time. Schiele acquired restricted NSM shares, limited in their marketability. Under such circumstances it was appropriate to apply a discount factor.

When asked about this procedure, the Duff & Phelps expert, Claire Hansen, replied "it is absolutely common practice that [such shares] be sold at a discount." Tr. August 23, 1984, pp. 92, 93. The one-third discount was not based on chance or speculation but rather on an empirical study of cash transactions of NSM shares undertaken by the Touche Ross accounting firm in 1973, at an earlier stage in this proceeding. The Touche Ross report, relied upon at the time, showed that during that period NSM stock was issued at discounts ranging from 20 to 40 percent, and the one-third ratio used by the Special Master was a weighted average of the range of discounts.

Schiele's counsel also contended that even if the two companies were not valued on basis of the actual worth of the merger transaction, the discounted cash flow analysis utilized by Duff & Phelps and the Special Master in their appraisals was unrealistic since it did not adequately reflect prices actually paid for comparable companies at the time. The relevant data on those companies have been considered and reviewed and Schiele's contentions are not supported.

In an attempt to justify the reasonableness of his $4.1 million valuation, Schiele's expert relied upon an alternative approach based on a representation of 1969 earnings and an application of a price/earnings multiplier of 30. In doing so, he annualized 9-months earnings of May 31, 1969 and arrived at a projected 12-months earnings result of $200,000. However, this approach and methodology was seriously flawed for several reasons. The asserted 1969 earnings improperly included earnings of two companies in addition to Mailbag/M.I.I. These companies, Dufftor and Youth Marketing, were related and acquired by NSM at the same time. But NSM paid for those companies by cash and notes; they were not a part of the merger and the transfer of stock for stock.

The claimants' expert offered unsatisfactory testimony—vague and generalized, in explaining that appropriate adjustments were made to exclude the earnings of those companies from the projected 1969 earnings. After claimants made known that Mailbag's corporate tax returns were questioned by the Internal Revenue Service, no reliable earnings data were ever supplied. In addition, there was no reliable or credible testimony from the claimants to show and test the reasonableness of the multiplier of 30 upon which the expert relied, even

assuming that necessary adjustments were made. Finally, an evaluation based on only a 1–year earnings record, fell far short of serving as a realistic basis for determining valuation.

### 1.

A hotly contested area of concern arose from the insistence of Schiele and his counsel that October 14, 1969, rather than the date of August 8, 1969, should be used for ultimate determination of the valuation of NSM shares. The Court agrees with the claimants. While the agreement was signed and dated by the parties on August 8, it was not operative at that time but still required approval of the shareholders of both NSM and the claimants. Under the circumstances, it was reasonable and proper to accept October 14, 1969, when they had shareholder approval and the stock transfer occurred for all parties to the merger. While transfer of the shares may be considered a mere formality, obtaining shareholder approval was entirely different. The agreement between the parties was contingent upon necessary shareholder approval and that was not secured on August 8, 1969.

The Court finds that October 14, 1969, when the NSM and the claimants' shareholders voted for the merger, was the effective date of merger and the appropriate valuation date. The mean average bid and ask price of NSM stock on that date was $46 per share. The fair market value of Mailbag/M.I.I. on that date was $2,987,056 [ (90,434 − 13,500) × $46 × ⅔ + 627,750 = $2,987,056]

### CONCLUSIONS OF LAW

Federal law governs the various aspects of this securities law litigation based on Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated pursuant to section 10(b) of the Securities & Exchange Act of 1934, 15 U.S.C. § 78j(b). *Huddleston v. Herman & MacLean*, 640 F.2d 534, 557 (5th Cir.1981), *aff'd in relevant part*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Although the valuation questions before the Court arise out of settlement agreements, the damage formula contained in the Plan of Distribution is based on securities law principles. Thus, securities law damage and valuation guidelines are especially instructive in this matter.

Fair market value has been defined as that which a willing buyer would pay a willing seller when neither is under any compulsion and both are reasonably informed as to all relevant facts. *Klapmeier v. Telecheck International, Inc.*, 482 F.2d 247, 252 (8th Cir.1973); *Bar L Ranch, Inc. v. Phinney*, 426 F.2d 995, 999 (5th Cir. 1970).

■ Federal courts have recognized the special difficulty in valuing small, closely held corporations. *Glick v. Campagna*, 613 F.2d 31, 37 (3d Cir.1979). In the absence of an active market for a corporation's stock, the value of the corporation should be based on an assessment of all available evidence of value. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *Glick v. Campagna*, 613 F.2d at 37; *O'Malley v. Ames*, 197 F.2d 256, 258 (8th Cir.1952); *Francis I. duPont & Co. v. Universal City Studios, Inc.*, 312 A.2d 344, 347–48 (Del. Ch.1973), *aff'd*, 334 A.2d 216 (Del.1975); Treas.Reg. § 20.2031–2(e). If necessary, the finder of fact may consider relevant evidence gathered a reasonable time after the stock sale. VI L. Loss, Securities Regulation 3922–23 (1969); *Dupuy v. Dupuy*, 551 F.2d 1005, 1025 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). A variety of factors may be considered relevant, depending on the particular circumstances. In *Gottlieb v. Sandia American Corp.*, 304 F.Supp. 980, 992 (E.D.Pa.1969), *aff'd in relevant part*, 452 F.2d 510 (3d Cir.), *cert. denied*, 404 U.S. 938, 92 S.Ct. 274, 30 L.Ed.2d 250 (1971), the court referred valuation questions to a special master and directed him to consider a variety of factors, such as the value of similar concerns, the value of intangible assets such as management quality, capitalized future earnings, and the bid and ask prices for the stock.

■ It is reasonable and appropriate for the Special Master to apply a one-third

discount to the value of restricted NSM shares to reflect their lack of marketability. *Fox v. Kane-Miller Corp.*, 398 F.Supp. 609, 647–49 (D.Md.1975), *aff'd*, 542 F.2d 915 (4th Cir.1976).

In situations such as presented here, where there is disagreement among the expert witnesses and the Court is called upon to evaluate and pass on the merits of the different views expressed by them, the Court must determine whether a particular expert opinion is supported by the record, is reasonable and also whether the opinion has general acceptance. This has been done in arriving at the above valuations.

Based on all available evidence, the Special Master correctly determined that the value of Renselaar, which was the consideration exchanged by claimants Raymond Gold and Herbert Frank for NSM stock, was $4.1 million; that amount shall be the basis on which the Special Master shall calculate the claimants' actual losses.

Based on all available evidence, the Special Master correctly determined that the value of Mailbag/M.I.I. which was the consideration exchanged by claimant George Schiele for NSM stock was $2,987.057; that amount shall be the basis on which the Special Master shall calculate the claimant's actual losses.